[No. A111925. First Dist., Div. Two. Oct. 31, 2006.]

In re JEFFREY DAVID ELKINS on Habeas Corpus.

**COUNSEL**

Jeffrey David Elkins, in pro. per.; and Michael Satris, under appointment by the Court of Appeal, for Petitioner.

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Anya M. Binsacca, Stan Helfman, Scott Mather and Denise A. Yates, Deputy Attorneys General, for Respondent.

**OPINION**

**KLINE, P. J.**—Jeffrey David Elkins was convicted by jury in 1980 of first degree murder and robbery, with use of a deadly weapon, and sentenced to a prison term of 25 years to life. On March 4, 2005, the Board of Parole Hearings (Board)[1] found him suitable for, and granted, parole.

The Governor reviewed that decision and, on July 29, 2005, reversed it. Elkins challenges the reversal by petition for writ of habeas corpus, and we

---

[1] Legislation effective July 2005 substituted the former Board of Prison Terms with the Board of Parole Hearings (Pen. Code, § 5075, subd. (a)), and designated the governing agency,

issued an order to show cause. The Attorney General has now filed a return, and Elkins a denial to the return. We grant Elkins relief and reinstate his Board grant of parole.

BACKGROUND

This was Elkins's 11th time (10th subsequent parole consideration hearing) before the Board. His almost yearly appearances had begun in early 1993, as his minimum parole eligibility date neared.

A 2005 life prisoner evaluation report (the report) took this initial summary of the commitment offenses from the 1980 probation officer's report: Elkins and his victim, Larry Ecklund, were 19 years old, high school classmates and drug dealing associates. Elkins owed Ecklund money for drug purchases and was having difficulty paying. On June 16, 1979, the two were at a party at the home of Robert Lambrecht, a mutual friend and Elkins's partner in the crime to unfold. Lambrecht's parents were not home, and Elkins and Ecklund stayed overnight. Elkins entered a room where Ecklund was sleeping, intending to rob him of money and drugs. During the robbery, Ecklund woke up and attacked Elkins with a knife. Elkins beat him over the head with a baseball bat, ending his life. Elkins put the body in his car trunk and drove to a remote area near Truckee, California, where he dumped the body. Elkins robbed Ecklund's storage area and a girlfriend's house before leaving the state. His car was found, abandoned, in Montana, and he was arrested eventually in Washington State and waived extradition to California.

The report also related Elkins's own account: He and Ecklund were at the home "drinking alcohol and consuming cocaine." When Ecklund passed out, Elkins took him upstairs and laid him in a bed and then went back downstairs and kept drinking and using drugs. Once others at the party left, Elkins went back up to the room. "His intent was to rob [Ecklund] and then get out of town. Once he entered the room, he hit Ecklund with a bat that was inside the room. His reasoning was it would ensure he did not wake up while he was robbing him, but Ecklund woke up after receiving the blow." Elkins "hit him again," but did not "remember how many times . . . because he was very intoxicated." Elkins went to Lambrecht and told him what happened and that everything had "gotten out of hand." Lambrecht, he said, "knew about his intent to rob Ecklund, but neither of them planned to kill him." Elkins moved the body to his car trunk, and he and Lambrecht then cleaned up the room. Elkins left the bat at the house without cleaning it. He drove to an area near Truckee and "dumped the body down the side of a hill because he was too upset to bury the body."

formerly the California Department of Corrections, the California Department of Corrections and Rehabilitation, Division of Adult Operations (*id.*, § 5000).

Elkins confirmed his account at the hearing, explaining: "I was severely addicted to drugs and alcohol." He was 19 "[a]nd basically, I lost my job. I had some severe addictions. I had no money. In fact, I was heavily in debt to Larry and I blamed him for all my problems, basically. He was the one that introduced me to the cocaine and the weed and he was the connection. He cut me off. I mean, there's no excuse for what I did. I had no right to do what I did, no matter what he'd done to me. I was very lost and very confused and I didn't think I had any other way out." Asked whether he attacked first, Elkins said, "Yes, I did. In 1995, I straightened out the record of what actually happened. [¶] . . . [¶] He did not come at me with a knife. I hit him while he was sleeping in the bed. My intent was to knock him out and to take his money and get away, because I owed him a considerable amount of money. [¶] . . . [¶] I owed him a couple thousand dollars . . . . I was afraid, basically. I mean, I'd already tried to pawn a bunch of my dad's property to him for stuff and so when my dad asked me for the stuff, where's my stuff, I tried to get it back and he wouldn't. I was in a big mess. I just wanted to get out and get away. And I had no money, and so my plan was to knock him out and take his money and go and try to get myself straightened out, but it didn't work that way." He added: "After I hit him, he started moving around and I thought if you knock someone out, that they don't move around. And that's why I hit him more than once." Elkins did not "know" or "remember" how many times. "I wish I hadn't done it," he said: "If there's anything I could do to change it, I'd have done it a long time ago. I had no right, no right at all, to do what I did to him. He didn't do anything to deserve what I did."

Letters from Alameda County Senior Deputy District Attorney Rockne Harmon, a prosecutor in Elkins's case, and from the Chief of Police for the City of Pleasanton, urged denying parole. Harmon had written before to oppose release. These sources noted that Elkins had not always been forthcoming about the facts. The amount and location of Ecklund's blood on the bedroom wall, ceiling, hall, mattress, and in Elkins's car trunk, was evidence all along that Elkins had struck multiple blows with the bat. After the murder, Elkins had dragged Ecklund down a flight of stairs to the car, put the body in his trunk in the residence's garage, and then slept in the house. According to the police chief, a resident asked Elkins about noise coming from Elkins's car trunk, but Elkins dismissed the inquiry. " 'It was apparently [*sic*] that Ecklund kicked or knocked from inside the tru[n]k. He drove Ecklund to a gorge off I-80 near Donner Pass and abandoned him for dead.' " Elkins stood trial and was convicted before revealing where he had dumped the body. Ecklund's family and friends had to wait 10 months for closure on their loss. Officers found Ecklund's body partially eaten by animals and strewn about the gorge. Even then, Elkins "didn't show remorse."

Elkins had dropped out of high school after 11th grade to work, but had by now completed his GED and taken college courses in ministry. The report

detailed a superb record of achievement in classes, programs and vocational training while in prison. Commendations and letters of support abounded, and he enjoyed enthusiastic support from prison staff, with no serious disciplinary history for well over 20 years. He had good job skills, job prospects, and a waiting job offer at a hardware store. He had made plans for reintegrating into society, had arranged to live with his mother in Livermore, and had a pledge of support from a local church.

Elkins had an arrest for misdemeanor burglary as a youth, but no contact with juvenile authorities. He reported having begun drinking and using marijuana and cocaine in the 11th grade. He worked as an automotive painter, and had done landscaping and contract labor. At the time of the murder, he was on probation for burglary and had a pending charge of grand theft. Elkins was unmarried before his incarceration but, seven years before this hearing, had married. His wife had filed for divorce. He explained, "She decided that she couldn't keep hanging on year after year and waiting and not knowing if I'd ever get out and she wanted to go on."

Psychiatric evaluations indicated a low risk of violence, that he would do well outside, and that he had achieved good self-awareness and self-image. He told the panel: "What I did, I cannot change. No one has ever been sorrier for a mistake they've made. I had no right to take a human life. What I did was monstrous. I was filled with rage that I didn't know how to deal with. I was not—if I was taught, I didn't learn how to properly deal with emotions and that led to my drug and alcohol addiction. If I could give my own life to bring Larry back, I would do so, because I've learned the value of human life over the years."

Illustrating his drive to help others, Elkins said, was an incident two years earlier when a correctional officer, Goad, fell from a tree at San Quentin. "[H]e didn't get up. I saw someone hurt. I went to help. I just saw a person that was hurt. I could not have done otherwise, because of the person I've become today." Goad wrote in support of Elkins, stressing how remarkable it was that an inmate would show concern for an officer's safety. " 'Without regard for his own personal safety, he stayed by me to ensure that no other inmates harmed me or took my keys or safety equipment. Inmate Elkins is the lead man in PIA maintenance and is respected by both staff and inmates alike. He's courteous and hard-working.' "

### The Board's Decision

The Board panel, in a decision rendered orally by its presiding commissioner, concluded: "[T]he prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or public safety if released from

prison. This is an extremely, extremely vicious crime. Vicious crime. However, in reviewing all the suitability factors, it appears that [he has] made a concerted effort to enhance his suitability factors and after weighing all of that, we found that the prisoner is suitable for parole. We find that while in prison, the prisoner ha[s] enhanced his ability to function within the law upon release through participation in college programs. Although he doesn't have an associate degree, he is participating in that program. We know that he's gotten a GED since he's been in, and just an array of self-help programs that include participation in Alcohol[ics] Anonymous, the STARS program, participate[d] in Arts in Correction, participated in Alternative to Violence seminar. He was a facilitator to Alternative Violence seminar. He participated in training for training Alternative to Violence. He participated in self-esteem workshop, completed 10 weeks of self-esteem. He also participated in Narcotics Anonymous. He also participated in a walkathon to help abused children[]. The Friends Outside parenting class he participated in. The chapel program he's participated in, Arts in Correction, the Biblical things that he participated in, and it goes on and on. We also note that he ha[s] enhanced his . . . ability to get a job. He participated in vocational programs. We note that as maintenance mechanic, automobile mechanic, most important in the PIA industries, which in some instances are better than vocation because he actually ha[s] a chance to work in that environment and achieve a journeyman level . . . . I've been doing these for quite a while and I have not seen that many letters of support from supervisors . . . . Because of maturation, growth, and greater understanding and advanced age, we feel that that ha[s] reduced his probability of recidivism. He ha[s] realistic parole plans which include[] a job offer, a realistic job offer in a hardware store. His mother said that he could live with her. That seems realistic . . . . He ha[s] recently maintained positive behavior in an institution. We do note that he received two disciplinaries. We went through and reviewed all of the disciplinaries in the C-File. His most recent, I believe, was . . . maybe 22 years ago. And there was one other disciplinary in there from 10/1/1981. He was the victim of assault in th[at] case. He was charged with force and violence. And that was back in 1981 . . . ."

The commissioner noted some old writeups showing a problem with being late to work "back then," but told Elkins: "[I]f you contrast that with what your supervisors are saying, you've turned it all the way around from a person that was lazy, didn't want to go to work, missing work 20 years ago to now, everybody in the Prison Industry is writing you letters and attesting to your work ethic. So certainly that was a turnaround and you should be commended for that."

Turning to psychological evaluations, the commissioner noted that one had been adjusted to change Elkins's risk of violence from "the medium to low range," to "the low range," because clinical and risk factors were so low as to

"offset the historical factors." Elkins had a dependable family support system, a favorable prognosis for a law-abiding community life, and no evidence of personality disorder. There was some risk of resumed alcohol abuse, but this did not seem to be high. The Board addressed that risk by imposing parole conditions forbidding use of alcoholic beverages and requiring antinarcotics and THC testing.

### The Governor's Decision

The Governor reviewed the decision and, by a letter issued July 29, 2005, gave notice that he was reversing the Board's parole grant. We quote from an attached written review of July 19 signed by the Governor and stating his reasons.

"On the evening of July 16, 1979, Jeffrey Elkins and Larry Ecklund, Jr. both attended a party at the home of a mutual friend. Mr. Ecklund went to sleep in a guest bedroom of the house and Mr. Elkins decided to rob him. While Mr. Ecklund was sleeping, Mr. Elkins entered the bedroom and beat him numerous times in the head with a baseball bat. Mr. Ecklund died from his injuries. At some point that night, Mr. Elkins stole the victim's wallet, money, and drugs.

"The next day, Mr. Elkins disposed of Mr. Ecklund's body in a remote area. Over the next several days, he stole more of the victim's property, and then fled the state. Mr. Elkins was arrested in Washington approximately two weeks after the killing. . . ."

Elkins "was 19 years old, addicted to drugs and alcohol, . . . on probation for a burglary conviction from the previous year [and] being prosecuted for grand theft," a charge dropped once he was convicted for the life offense. "Within the first three years of his incarceration, he was disciplined two times for serious-rules violations. Moreover, reliable confidential information in Mr. Elkins'[s] prison file from 1990 indicates that Mr. Elkins was dealing drugs in prison.[2] Throughout his incarceration, Mr. Elkins also has been counseled seven times for minor misconduct.

---

[2] One document shows that an inmate caught with drugs admitted dealing and mentioned having given Elkins $50 for 10 "caps of weed" (marijuana) on another's behalf, keeping three for himself. A second document is a long interview with another inmate caught with drugs. This one admitted heavy involvement in dealing and, at one point, referred to Elkins as "a major dealer in 'Crank' " from whom he had once obtained a "hit" of the drug.

There is no indication that either report resulted in discipline. The Governor's reference to Elkins being "disciplined two times for serious-rules violations" within his first three years refers, apparently, to incidents in 1981 and early 1983, over 22 years before the hearing. There had been two incident reports of assault, but it was clarified at the hearing that, in one, Elkins

"After his conviction and for many years after his imprisonment Mr. Elkins attempted to portray the murder as self-defense. As stated in the probation officer's [1980] report, Mr. Elkins claimed that after stealing Mr. Ecklund's money, the victim awoke and came at him with a knife. Mr. Elkins stated that he grabbed a baseball bat to defend himself and ended up killing Mr. Ecklund. It was not until some time in the mid-1990s that Mr. Elkins admitted he attacked Mr. Ecklund as he slept. Mr. Elkins told his 1998 Life Prisoner Evaluator that he entered the room where Mr. Ecklund was sleeping and, with the plan of knocking the victim unconscious before robbing him, used the baseball bat to hit Mr. Ecklund once. Mr. Elkins claimed that Mr. Ecklund kept moving so he continued hitting the victim. He also said he was under the influence of drugs and alcohol and could not remember how many times he struck Mr. Ecklund. Moreover, in 2002, he told his mental-health evaluator that he was angry at the victim for cutting off his drug supply, and in 2005, he told the Board that he was heavily in debt to Mr. Ecklund for drug purchases.

"Although Mr. Elkins initially denied responsibility for the crime by claiming self-defense, he did appear to accept responsibility at the 2005 Board hearing and showed signs of remorse. This is certainly progress, but since Mr. Elkins has only accepted full responsibility for the murder for less than a decade now, his current insight into the life offense is too recent a gain to weigh in favor of his parole.

"To his credit, Mr. Elkins has remained discipline-free for a number of years and worked while incarcerated to enhance his ability to function within the law upon parole. He has earned a GED and has taken college and Emergency Management Institute classes. He has received vocational training in auto body and fender repair and in forklift operation. Likewise, Mr. Elkins has held several skilled institutional jobs. Additionally, Mr. Elkins has participated in self-help and therapy programs, including IMPACT Program, Self-Confrontation course, Manalive classes, Alternative to Violence, Self-Esteem Enhancement Group, Parenting Program, Alcoholics Anonymous, Narcotics Anonymous, and individual therapy. He has received positive evaluations from mental-health professionals and correctional officers, including commendations for assisting an injured correctional officer in 1999. He has donated to charities, volunteered with at-risk youth, and participated in Arts in Corrections. Furthermore, [he] has made confirmed plans for parole to live with his mother and step-mother and work at a hardware store in his last county of residence. These are all positive factors supportive of his release.

---

was the victim, having been stabbed by another inmate. The practice back then had been to write up both involved inmates, and Elkins "spent seven months in Max B," an increased custody level.

"But when considering Mr. Elkins'[s] suitability for parole, I cannot overlook the atrocious murder he committed. Intending to rob Mr. Ecklund, Mr. Elkins decided to attack the victim while he was sleeping. Unaware of what was happening, Mr. Ecklund was unable to defend himself. Mr. Elkins took advantage of the victim's vulnerability and repeatedly beat Mr. Ecklund in the head with a baseball bat, killing him. If Mr. Elkins simply wanted to steal Mr. Ecklund's belongings, he could have done so while the victim was sleeping or even after hitting him once. Instead, as he told his 1998 Life Prisoner Evaluator, the victim kept moving so he kept hitting him. This was a senseless and gruesome murder.

"And Mr. Elkins'[s] actions after the murder demonstrate those of a cold-blooded, dispassionate killer. As described in a 1980 letter from the Alameda County District Attorney's Office to the probation office, after the murder, Mr. Elkins placed Mr. Ecklund's body in the trunk of his car, went back into his friend's house, took a shower, and went to sleep. In the morning, he drove for many miles into the mountains, located a desolated area, and dumped Mr. Ecklund's body down a steep grade. According to the same letter, over the next several days he stole numerous items from Mr. Ecklund's storage unit and from Mr. Ecklund's girlfriend's residence. He then fled the state. Not only was the killing itself especially brutal, but the cold and calculated manner in which he disposed of the body is chilling. The gravity of it alone is sufficient for me to conclude that Mr. Elkins would pose an unreasonable risk to the public's safety if released from prison at this time.

"I note that the Alameda County District Attorney's Office sent a letter to the Board in 2004 opposing Mr. Elkins'[s] parole based on the seriousness of the murder and the circumstances surrounding it. Likewise, the City of Pleasanton Police Department sent an opposition letter in 2004 describing the gravity of the crime.

"Mr. Elkins has been incarcerated for a long time now, 26 years, and has made some creditable gains during that time. But given the current record before me and after carefully considering the same factors the Board must consider, I find the gravity of the murder he committed presently outweighs the positive factors supporting his release. Accordingly, because I believe at this time that his release from prison would pose an unreasonable risk of danger to society, I REVERSE the Board's 2005 decision to grant parole to Mr. Elkins."

### DISCUSSION

Elkins mounts three challenges to the Governor's decision. First, he claims, it constitutes a "retroactive" use of review authority created in 1988 (Cal.

Const., art. V, § 8, subd. (b)), for crimes committed in 1979, and that this violates federal due process and ex post facto principles. Second, he contends, the Governor's decision cannot pass due-process-based judicial review for "some evidence" because it is based on immutable circumstances related to the offense. To the extent that the decision rests on belated acceptance of responsibility for his crimes, Elkins claims, this violates a statutory bar against requiring an inmate to admit guilt (Pen. Code, § 5011). Third, Elkins claims, the reversal denies him state and federal due process and equal protection, again because the decision lacks any basis in fact and relies on a disallowed factor.

We begin with an overview of the law as summarized in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), and two subsequent decisions of our own court, *In re Scott* (2004) 119 Cal.App.4th 871 [15 Cal.Rptr.3d 32] (*Scott I*), and *In re Scott* (2005) 133 Cal.App.4th 573 [34 Cal.Rptr.3d 905] (*Scott II*), and by setting out applicable constitutional, code and regulatory framework.

■ Parole suitability decisions for inmates serving indeterminate life terms are made, in the first instance, by the Board. (*Scott I, supra*, 119 Cal.App.4th at pp. 884–885.) The Board has broad discretion, must normally set parole release in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the public safety (*ibid.*; Pen. Code, § 3041, subd. (a)), and must set a parole release date unless it determines that the gravity of the current convicted offense or offenses, or their timing and gravity, are such that public safety requires a more lengthy period of incarceration (*Scott I*, at p. 885; Pen. Code, § 3041, subd. (b)). That decision is guided, in turn, by regulations directing the Board's consideration to six nonexclusive circumstances tending to show unsuitability (Cal. Code Regs., tit. 15, § 2402, subd. (c)) and nine tending to show suitability (*id.*, § 2402, subd. (d)).[3] (*Scott I*, at pp. 888, 897.)

■ "According to the applicable regulation, circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (. . . § 2402, subd. (c).)" (*Rosenkrantz, supra*, 29 Cal.4th at pp. 653–654, fn. omitted.) Circumstance (1) is supported where "(A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a

---

[3] We will cite all constitutional and code references in full, but cite regulations, all from title 15 of the California Code of Regulations, only by section number.

dispassionate and calculated manner, such as an execution-style murder; (C) the victim ·was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (. . . § 2402, subd. (c)(1).)" (*Rosenkrantz,* at p. 653, fn. 11.)

■ Regulation provides that "circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (. . . § 2402, subd. (d).)" (*Rosenkrantz, supra,* 29 Cal.4th at p. 654.)

"Finally, the regulation explains that the foregoing circumstances 'are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.' (. . . § 2402, subds. (c), (d).)" (*Rosenkrantz, supra,* 29 Cal.4th at p. 654.)

Court review of the Board's decision is governed by a deferential "some evidence" standard designed to ensure minimum procedural due process protection. (*Rosenkrantz, supra,* 29 Cal.4th at p. 658; see *Scott I, supra,* 119 Cal.App.4th at pp. 885–887.)

■ A Governor's review of a Board suitability decision is constitutionally authorized but "subject to procedures provided by statute" (Cal. Const., art. V, § 8, subd. (b)). The Governor may review, and then affirm, modify or reverse the decision "on the basis of the same factors which the parole authority is required to consider" and must issue a written statement of his or her reasons (*ibid.*; see Pen. Code, § 3041.2, subd. (b)).

Court review of a Governor's decision ensures, among other due process rights, that the decision be supported by some evidence, the same standard for reviewing Board decisions. "[T]he voters in adopting the constitutional provision placed substantive limitations upon the Governor's exercise of that judgment and discretion. The provision mandates that the Governor consider only the same factors that may be considered by the Board. Having chosen to

review a parole decision, the Governor lacks discretion to disregard this requirement, which distinguishes the Governor's parole review authority from his authority to grant pardons and commutations. Because this requirement gives rise to a liberty interest protected by due process of law, and because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 663–664.) "[T]he 'some evidence' standard is extremely deferential and reasonably cannot be compared to the standard of review involved in . . . considering whether substantial evidence supports the findings . . ." (*id.* at p. 665); nevertheless, it requires " ' "some indicia of reliability" ' " (*Scott II, supra,* 133 Cal.App.4th at p. 591, quoting *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 915) and "may be understood as meaning that suitability determinations must have some rational basis in fact" (*Scott II,* at p. 590, fn. 6).

While the Governor must consider the same circumstances as the Board, the Governor may give them different weight and draw different conclusions. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 669–670.)

## I. *Threshold Issues of Retroactivity and Due Process*

Three of the parties' arguments are threshold issues having little to do with the reasoning or evidence behind the Governor's decision. We address those issues first.

A Governor's review authority to reverse Board decisions of parole suitability did not exist at the time of Elkins's 1979 crimes (*Rosenkrantz, supra,* 29 Cal.4th at pp. 658–659; *In re Fain* (1983) 145 Cal.App.3d 540, 557 [193 Cal.Rptr. 483]), but was established by a 1988 voter amendment to the state Constitution (Cal. Const., art. V, § 8, subd. (b); *Rosenkrantz, supra,* 29 Cal.4th at pp. 636–637, 659) and implementing statutes and regulations (*Rosenkrantz,* at pp. 653–654). Elkins argues that the use of that power constituted an unconstitutional ex post facto application, but we are bound by stare decisis to disagree. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Our Supreme Court examined at length and rejected this argument in *Rosenkrantz,* utilizing both state and federal ex post facto analysis. (*Rosenkrantz,* at pp. 636–652.) Elkins stresses federal authority, but calls our attention to none that is directly on point or that did not exist when *Rosenkrantz* was decided in December 2002. He concedes that we are bound and simply "preserves this issue for further review."

The "due process" adjunct of Elkins's same argument seems, to some extent, meant to bolster his ex post facto claim by urging that the mechanism

for gubernatorial review has effectively increased his punishment. Thus, he stresses that the new review creates an additional obstacle to release and that a Governor conducts an independent review and may rely on factors not relied upon by the Board. This may be true but, we hold, does not change the stare decisis effect of the ex post facto analysis in *Rosenkrantz,* which considered such arguments and, in any event, concluded that the change was a procedural one that did not offend ex post facto principles. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 640–652 & fn. 10.)

Elkins also urges that, because a Governor's decision "may rest upon different grounds than the evidence supporting the basis of the [Board's] decision," the process "violates minimal due process requirements enunciated" in *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1 [60 L.Ed.2d 668, 99 S.Ct. 2100] (*Greenholtz*), by denying parole applicants an "opportunity to be heard." *Greenholtz,* however, cautioned, "Merely because a statutory expectation [of parole] exists cannot mean that in addition to the full panoply of due process required to convict and confine there must also be repeated, adversary hearings in order to continue the confinement." (*Id.* at p. 14.) It then explained as to board-level parole decisions in that state: "[T]he inmate is permitted to appear before the Board and present letters and statements on his own behalf. He is thereby provided with an effective opportunity first, to insure that the records before the Board are in fact the records relating to his case; and second, to present any special considerations demonstrating why he is an appropriate candidate for parole. Since the decision is one that must be made largely on the basis of the inmate's files, this procedure adequately safeguards against serious risks of error and thus satisfies due process." (*Id.* at p. 15, fn. omitted.) Elkins does not contend that his due process protections before the *Board* in this case were any less than those afforded the inmate in *Greenholtz,* and he cites no authority from any jurisdiction that a parole applicant has a due process right to appear personally before a governor. The Governor's review of a Board suitability decision is constitutionally authorized "subject to procedures provided by statute" (Cal. Const., art. V, § 8, subd. (b)), must be conducted "on the basis of the same factors which the parole authority is required to consider," and must conclude with a written statement of reasons for his or her decision (*ibid.*; see Pen. Code, § 3041.2, subd. (b)). An inmate has the chance to develop a record and anticipate all grounds when the matter is before the Board. We do not perceive any due process problem with the fact that the Governor may rely on grounds or evidence that the Board has assessed differently, and we are dismayed that neither party cites authority that has found no due process flaw in this regard (*In re Arafiles* (1992) 6 Cal.App.4th 1467, 1479–1481 [8 Cal.Rptr.2d 492]).

Elkins also argues that the review is "arbitrary" because it affords a Governor a means of *routinely* reversing relatively rare release decisions and,

he urges, frustrates a legislative purpose that an eligible inmate "normally" receive a parole date (Pen. Code, § 3041, subd. (a)). Again, however, *Rosenkrantz* rejected this as a basis for an ex post facto challenge. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 651–652.) Similar facts were also insufficient to show a "blanket policy," by a former Governor, of arbitrariness in failure to give each case individualized consideration of the relevant factors (*id.* at pp. 682–684). Rejection of that due process claim was based in part on a gubernatorial track record of reversing 47 of 48 parole grants and early press interviews seemingly showing a resolve to deny parole to any murderer (*id.* at pp. 684–685). That reversal rate, which Elkins calculates as 97 percent for former Governor Gray Davis, contrasts markedly with the lower reversal rate of our current Governor, which Elkins concedes as having "hovered between 65% and 75%." Our record also lacks statements by this Governor professing an intent to routinely deny parole, without considering the circumstances. Thus *Rosenkrantz* compels rejection of the arbitrariness claim.

In his denial to the return, Elkins tries to parlay this same argument into a claim for injunctive relief "TO FORCE THE GOVERNOR TO STOP HIS ILLEGAL PRACTICE" of assertedly arbitrary reversals. He offers only broad assertions, however, and no factual basis for assessing this question in the context of any other applicants' cases. Moreover, he does not properly join the issue of injunctive relief. He never hinted at injunctive relief in his petition and raised it for the first time in his denial, when the Attorney General could not respond (*People v. Romero* (1994) 8 Cal.4th 728, 738–739 [35 Cal.Rptr.2d 270, 883 P.2d 388]).

A final threshold matter is whether a due process liberty interest in parole arises, under our state's parole scheme, for purposes of the federal Constitution. The Attorney General contends that it does not, noting that *Rosenkrantz* found a right to due process review under the *state* Constitution (*Rosenkrantz, supra,* 29 Cal.4th at pp. 658 & fn. 12, 660–661; *Scott II, supra,* 133 Cal.App.4th at p. 590), and that the federal high court has not ruled on this question under the California parole scheme. We are also cited one federal district court decision that broke ranks with other precedent of its circuit and, relying on language in *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783], held that California's scheme does *not* create a liberty interest triggering federal due process protection (*Sass v. California Bd. of Prison Terms* (E.D.Cal. 2005) 376 F.Supp.2d 975, 981–983). That decision, however, never garnered support (*Martin v. Marshall* (N.D.Cal. 2006) 431 F.Supp.2d 1038, 1044 [cataloguing cases rejecting it]) and now has been overruled by the Ninth Circuit, which has reaffirmed a federal due process liberty interest and held that the aberrant decision misconstrued *Dannenberg* (*Sass v. California Bd. of Prison Terms* (9th Cir. 2006) 461 F.3d 1123, 1127–1128). In any event, Elkins clarifies in his denial

that he relies solely on *state* due process, since it affords him at least as much protection as any corollary federal right (*Rosenkrantz*, at p. 658, fn. 12 ["petitioner does not contend that the federal Constitution imposes a more stringent standard of review than the 'some evidence' standard"]). We therefore have no occasion to further explore or rely upon the federal right.

## II. *"Some Evidence" Review*

The key question is whether "some evidence" supports the Governor's decision, and we narrow the inquiry, first, by passing over suitability factors that are undisputed. One, commission of an offense as a result of battered woman syndrome, obviously does not apply, and we accept, on this record, that the evidence uniformly shows that Elkins had no record of violent crime as a juvenile, had a stable social history, committed the crime as a result of significant stress in his life, had no other history of violent crime, and had made realistic plans for release and developed marketable skills to use upon his release. (§ 2402, subd. (d); *Rosenkrantz, supra*, 29 Cal.4th at p. 654; *Scott I, supra*, 119 Cal.App.4th at p. 897.) The Governor was free to independently decide what *weight* to accord those factors (*Rosenkrantz*, at pp. 669–670), but they are undisputed. Also, "[i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (*Id.* at p. 677.) Thus, while Elkins argues that the Governor did not give favorable factors *enough* weight, our "some evidence" scope of review does not allow us to second-guess the Governor's weighting choices. Finally, and contrary to argument from Elkins, it does appear that the Governor considered and at least implicitly accepted all of the above favorable factors.[4]

---

[4] Elkins argues that the Governor overlooked stress as a contributing factor, particularly long-term stress that had led him to self-medicate with drugs and alcohol, and ignored as well lack of other violent crimes as a juvenile or adult, or that his age (47) reduced the probability of recidivism. We reject the argument.

Elkins likens his case to *Scott II*, where a Governor's decision both failed to mention stress or other suitability factors in detail, and simply stated that the gravity of the offense alone was enough to create an unreasonable public safety risk and outweigh any favorable factors. (*Scott II, supra*, 133 Cal.App.4th at pp. 587–589, 593–594.) Here, by contrast, the decision specifies at length numerous favorable circumstances, notes creditable gains and commendations, and notes that Elkins was under the influence of alcohol and drugs, and angry with the victim, at the time of the murder. This record does not show a failure to give individualized consideration to all factors, and Elkins cites no authority that a Governor's decision must specify in detail every pertinent fact relied upon. (Cf. *Greenholtz, supra*, 442 U.S. at p. 15 ["nothing in the due process concepts as they have thus far evolved . . . requires the Parole Board to specify the

We also disregard circumstances of *unsuitability* that were not relied upon by the Governor. (See *Scott II, supra,* 133 Cal.App.4th at pp. 595–596.)

The Governor's decision rests on factors that (1) the murder was committed in an especially heinous, atrocious or cruel manner (§ 2402, subd. (c)(1)), and (2) Elkins was initially unwilling to accept full responsibility for the murder, an issue that has been treated as working against showing remorse (§ 2402, subd. (d)(3); *Rosenkrantz, supra,* 29 Cal.4th at p. 674).[5] We examine the second factor first.

### Acceptance of Responsibility

The pertinent regulation states: "Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense." (§ 2402, subd. (d)(3).) The issue here is whether Elkins showed that he "understands the nature and magnitude of the offense." The Governor reasoned: "Although Mr. Elkins initially denied responsibility for the crime by claiming self-defense, he did appear to accept responsibility at the 2005 Board hearing and showed signs of remorse. This is certainly progress, but since Mr. Elkins has only accepted full responsibility for the murder for less than a decade now, his current insight into the life offense is too recent a gain to weigh in favor of his parole."

We first reject Elkins's position that this factor is barred from consideration by Penal Code section 5011, subdivision (b), which states: "The Board of Prison Terms [now Board of Parole Hearings] shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was

---

particular 'evidence' in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release"].) Elkins's age, for example, was implicitly known and considered. It was obvious from the fact, recited in the decision, that Elkins was 19 years old at the time of the 1979 murder. Moreover, Elkins does not cite any record indication that his age (47 years) significantly reduced his risk of recidivism.

[5] The decision also states in its fact recitation: "Within the first three years of his incarceration, [Elkins] was disciplined two times for serious-rules violations. Moreover, reliable confidential information in [his] prison file from 1990 indicates that [he] was dealing drugs in prison. Throughout his incarceration, [Elkins] also has been counseled seven times for minor misconduct."

At first glance, that might suggest reliance on unsuitability due to: "Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." (§ 2402, subd. (c)(6).) Later in the decision, however, the Governor treats Elkins's disciplinary record as one of many "positive factors supportive of his release," despite the decades-old information: "To his credit, Mr. Elkins has remained discipline-free for a number of years and worked while incarcerated to enhance his ability to function within the law upon parole. . . . These are all positive factors supportive of his release."

committed." Whatever the implications of that ban in other contexts, it was not violated here. First, the Board did advise Elkins at the outset of the hearing, "You're not required to admit to guilt," and he replied that he understood. More importantly, Elkins had admitted his guilt of these crimes decades earlier. Thus, the Governor relied not on a lack of guilt admission, but on Elkins having delayed coming forward with all *circumstances* of what he admitted.

On the merits of this factor, however, the Governor's decision is oddly misinformed. In concluding that Elkins's "current insight into the life offense is too recent a gain to weigh in favor of his parole," the Governor cites Elkins's initial claim of self-defense, that he "did appear to accept responsibility at the 2005 Board hearing and showed signs of remorse," calling this "certainly progress," but then states, inaccurately, that Elkins "has only accepted full responsibility for the murder for less than a decade now . . . ." In fact, as of the Governor's July 2005 writing, Elkins had accepted full responsibility for *more than* a decade. Elkins had still claimed self-defense in February 1993, *12 years earlier*, when at his very first hearing before the Board, he expressed remorse but said he had picked up the bat only after Ecklund came at him with a knife and then struck him further after Ecklund threw the knife at him.[6] From a May 1995 hearing on, however, Elkins conceded that Ecklund was asleep from the start and that, while Ecklund had a knife lying on the headboard, he never pulled it. Elkins explained back then: "Since last year, I've given my life to God. I joined the church and God's put it on me to straighten out some lies that I've been living. I need to make myself right with God regardless of the consequences. And it's not true that I was attacked by Ecklund with a knife. The DA's account is ninety-nine percent accurate. I did hit him while he was asleep in bed." He added: "[T]here was no fight, there was no scuffle. I hit him—I don't know how many times I hit him. I was trying to knock him out, and he wouldn't go out. And when he finally did go out, it was for good. [¶] . . . [¶] And I had no right to do what I did. I will state that again, but I need to make that clear on the record today."

Thus, the facts underlying the Governor's conclusion are mistaken, perhaps grossly so. He states: Elkins "did appear to accept responsibility at the 2005 Board hearing and showed signs of remorse. This is certainly progress . . . ." That suggests a misimpression that self-defense had been abandoned only within the last parole review period, a notion perhaps bolstered by letters of late 2003 and 2004 from prosecutor Harmon who, in urging that Elkins not

---

[6] Elkins told the 1993 Board: "I never ever meant—I never went in there with the intention of hurting Larry. I never wanted to hurt him. Things got out of control and I am sorry that it happened. Not because I'm in prison but because I did take somebody's life. And nobody has the right to do that."

be "rewarded" for changing his account, wrote misleadingly of him "finally admitting the details of the crime" and having " 'finally admitted what was not in question, that he savagely beat and killed his sleeping friend.' " "Finally" hardly describes a concession made in 1995. On the other hand, the Governor's decision earlier states, "It was not until some time in the mid-1990s that Mr. Elkins admitted he attacked Mr. Ecklund as he slept. Mr. Elkins told his 1998 Life Prisoner Evaluator that he entered the room where Mr. Ecklund was sleeping and, with the plan of knocking the victim unconscious before robbing him, used the baseball bat to hit Mr. Ecklund . . . ." That is closer to the truth, but mistakenly suggests that Elkins first told the full truth—at least to the Board—in 1998.

Whatever the actual extent of the error, our review for "some evidence" reveals nothing rationally supporting a conclusion that Elkins's acceptance of full responsibility, for over a decade, was "too recent a gain to weigh in favor of his parole."[7] There is no minimum time requirement. Rather, acceptance of responsibility works in favor of release "[no] matter how longstanding or recent it is," so long as the inmate "genuinely accepts responsibility . . . ." (*In re Lee* (2006) 143 Cal.App.4th 1400, 1414 [49 Cal.Rptr.3d 931].) Here, the Governor did not suggest any doubt of Elkins's sincerity, and besides, the record shows over a decade of fully accepted responsibility. There is thus no rational support for the astounding conclusion that Elkins's decade-long acceptance of full responsibility does not even "weigh in favor of his parole."

### *The Murder as Especially Heinous, Atrocious or Cruel*

This leaves the Governor's decision resting on a conclusion that the "gravity" of the offense, described as an "atrocious" or "especially brutal" murder, outweighed the "positive factors supporting" Elkins's release. The Governor also noted that the gravity of the offense "alone" may support denial of parole.

---

[7] Accompanying the administrative record filed with this court, subsequent to the return, is a declaration from Board senior legal analyst Tom Remy, who explains that when an inmate's central file is forwarded to a Governor after review by the "decision review unit," it is accompanied by a transcript of the Board's latest hearing and, among other things, "any hearing transcripts wherein the inmate had been given a prior release date." Remy writes that, here, "there were no additional hearing transcripts forwarded because Elkins had not been granted parole before 2005." Elkins urges that the absence of a transcript of the 1995 Board hearing transcript, where he first renounced his self-defense story, explains the Governor's misperception.

■ *Scott II* summarizes the law in this situation. "The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct [citation], but the proposition must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair [citation], and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. [Citation.] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny." (*Scott II*, *supra*, 133 Cal.App.4th at pp. 594–595, fns. omitted.)

Chief among the Governor's reasons for finding an "atrocious murder" were these: "Intending to rob Mr. Ecklund, Mr. Elkins decided to attack the victim while he was sleeping. Unaware of what was happening, Mr. Ecklund was unable to defend himself. Mr. Elkins took advantage of the victim's vulnerability and repeatedly beat Mr. Ecklund in the head with a baseball bat, killing him. If Mr. Elkins simply wanted to steal Mr. Ecklund's belongings, he could have done so while the victim was sleeping or even after hitting him once. Instead, as he told his 1998 Life Prisoner Evaluator, the victim kept moving so he kept hitting him. This was a senseless and gruesome murder." The decision goes on to discuss postkilling events, but calls "the killing itself especially brutal . . . ."

■ Initially, we observe, Elkins's ability to have robbed Ecklund without hitting him, or perhaps hitting him just once, sheds no light on whether this murder was "especially brutal" or "gruesome." First degree murder is the "Commitment Offense" that drew the indeterminate life term in this case, and whose gravity has to be "especially heinous, atrocious or cruel" to merit parole denial. (§ 2402, subd. (c)(1).) The robbery drew a concurrent determinate term.[8] Needlessly striking a robbery victim may, of course, show an especially heinous, atrocious or cruel *robbery*, but does not necessarily show an especially brutal *first degree murder*. On the facts of this case, with the

---

[8] The term length, according to the court's pronouncement in a sentencing transcript from July 1980, was three years, but a written order and abstract of judgment, as amended in September 1980, do not specify the length.

victim continuing to move after a first blow, Elkins had to strike his victim multiple times in order to kill him. Because it violates due process to deny parole " 'where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense' " (*Scott II, supra,* 133 Cal.App.4th at p. 598), the Governor could not rely on the fact that Elkins might have avoided killing to show his killing to be especially brutal.

Of course, robbery *as a motive for a murder* could be deemed aggravating if "very trivial in relation to the offense" (§ 2402, subd. (c)(1)(E)), and the Governor's decision does speak of "a *senseless* and gruesome murder" (italics added). The decision, however, seems to accept Elkins's account that he planned with Lambrecht to rob Ecklund, entered the room heavily intoxicated, grabbed a bat that was in the room and struck Ecklund once to incapacitate him, not to kill him. He struck further blows when Ecklund woke up and kept moving. Elkins told Lambrecht afterward that everything had gotten out of hand. By that account, robbery was the motive that set in motion the fatal encounter, but there never was a plot to kill Ecklund in order to rob him.[9]

The regulations also propose unsuitability for offenses against multiple victims (§ 2402, subd. (c)(1)(A)), which did not apply here, and for offenses "carried out in a dispassionate and calculated manner, such as an execution-style murder" (*id.,* subd. (c)(1)(B)). The robbery in this case may be characterized as calculated, particularly since it was planned with a cohort and initiated with a blow to the head on a sleeping victim, but again, our focus is on the life-term murder. The evidence shows that killing was an afterthought, if thought about at all. If there was malice aforethought (but see fn. 9, *ante*), it arose spontaneously when the victim woke up and then kept moving. The Governor implicitly accepted this, writing: "as he told his 1998 Life Prisoner Evaluator, the victim kept moving so he kept hitting him."

---

[9] Our record contains no trial transcripts or other preserved testimony, and thus we are left—as was the Governor—with the facts as conveyed mainly in the report and the transcript of the Board hearing.

We also have no jury instructions from the trial. Thus, while a conviction for first degree murder might ordinarily suggest malice from, perhaps, a suddenly formed intent to kill (*People v. Saille* (1991) 54 Cal.3d 1103, 1114–1115 [2 Cal.Rptr.2d 364, 820 P.2d 588]), the killing in this case having occurred during the commission of robbery strongly suggests felony-murder instructions that allowed a first degree murder verdict without any finding of malice (*People v. Dillon* (1983) 34 Cal.3d 441, 462–465, 475–477 & fn. 24 [194 Cal.Rptr. 390, 668 P.2d 697]).

Since the Governor accepted that account, it would have been irrational to reason that the murder, as opposed to the robbery, was carried out in a calculated manner, and we do not read his decision as finding that the murder itself was calculated or dispassionate.[10]

Rather, the decision concludes that Elkins's "actions *after* the murder demonstrate those of a cold-blooded, dispassionate killer" (italics added). It cites Elkins going ahead to take Ecklund's wallet, money and drugs, driving the body to Donner Pass the next morning and dumping it down a steep grade, stealing from Ecklund's storage unit and his girlfriend's residence over the next several days, and then fleeing the state. That is the essence of the Governor's decision that this murder was especially heinous, atrocious or cruel, thus making Elkins's release at this time an unreasonable risk of danger to society. Given the lapse of 26 years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to "some evidence" supporting denial of parole.

The commitment offense, this court has observed, is an unsuitability factor that is immutable and whose predictive value "may be very questionable after a long period of time [citation]." (*Scott II, supra,* 133 Cal.App.4th at pp. 594–595, fn. omitted.) We have also noted, as has our Supreme Court, strong legal and scientific support that "predictions of future dangerousness are exceedingly unreliable," even where the passage of time is not a factor and the assessment is made by an expert. (*Id.* at p. 595, fn. 9.) Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by

---

[10] Not mentioned anywhere in the Governor's decision is information, in the letter from the Pleasanton Police Chief Timothy Neal, that an unnamed "resident questioned Elkins about noises from Elkins'[s] car trunk," and that Elkins "dismissed the inquiry." Neal says that this was "apparently Ecklund kicking or knocking from inside the trunk" and further suggests that when Elkins drove the next day to Donner Pass, he "abandoned [Ecklund] for dead," implying that Ecklund might have been still alive.

That information, if credited as reliable, would favor unsuitability due to "exceptionally callous disregard for human suffering" (§ 2402, subd. (c)(1)(D)), yet the Governor does not cite that factor, or Neal's information. It is unclear, moreover, where Neal got his information about the "resident" asking about noises. His letter does not say, and we find it nowhere else in the record. It is significantly absent from the antirelease letter from Rockne Harmon, who had prosecuted Elkins and surely would have referred to any such evidence. We infer that the Governor doubted its reliability and discounted Neal's surmise about Ecklund being still alive, for while the decision does note "an opposition letter" from the Pleasanton Police Department, it does not cite that particular information or rely on the pertinent regulatory factor. It also states that Elkins placed Ecklund's "body" in the car trunk that night and dumped the "body" at Donner Pass the next day, clearly accepting that Ecklund was already dead.

the prison system, and result in a due process violation. (*Id.* at p. 595.) "A parole hearing [also] does not ordinarily provide a prisoner a very good opportunity to show his offense was not committed 'in an especially heinous, atrocious or cruel manner,' even if such evidence exists and the prisoner is willing to run the risk his effort to make such a showing will be seen as unwillingness to accept responsibility and therefore evidence of unsuitability." (*Id.* at p. 601, fn. 13.) This may be made worse by the absence of a trial transcript (*ibid.*). That was the case here, but Elkins did not specifically dispute the report summary of facts.

██ We also take into account that whatever facts make a given offense aggravated or mitigated, compared to the hypothetical average, are not overlooked or disregarded when the Board sets a release date. The Board's decision that a prisoner is suitable for release (§ 2402, subd. (a)) is distinct from its choice of a base term fixing an actual release date (§ 2403, subd. (a)). A release date is set by a calculation under matrixes (§ 2403, subds. (b)–(f)) that require the Board to weigh myriad facts of the offense that might be deemed aggravating (§ 2404) or mitigating (§ 2405), including any factors that would have been considered by a judge in choosing a determinate sentence (§§ 2404, subd. (a)(20), 2405, subd. (a)(10); see Cal. Rules of Court, rules 4.421, 4.423). Thus, release may come years after a suitability determination. (*Sass v. California Bd. of Prison Terms, supra,* 461 F.3d at p. 1132 (dis. opn. of Reinhardt, J.).) The base term as calculated here did not require further prison time but did take into account circumstances that the Board found aggravating.[11] Thus, a Governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating that release currently poses "an unreasonable risk of danger to society" (§ 2402, subd. (a); accord, Pen. Code, § 3041, subd. (b)).

By the time of the Governor's 2005 review, Elkins had served 26 years, 11 beyond his minimum eligibility date. The gravity of his offense had been cited as the prime reason for denial in every Board decision from 1993 through 2003: first in February 1993 ("especially heinous, atrocious, cruel and callous," "dispassionate and calculated"); second in January 1994 ("very violent" and "vicious" crime); third in May 1995 ("especially heinous, cruel and callous," "atrocious and cruel"); fourth in August 1996 ("very cold and callous" and "horrible"); fifth in August 1997 ("violent" and "very horrible"); sixth in August 1998 (parole denied; reasons incomplete in our record); seventh in November 1999 ("especially cruel and callous," "dispassionate and

---

[11] The Board aggravated the base term for Elkins having a prior relationship with the victim, having a special relationship of confidence with him, the death being due to severe trauma, the victim being particularly vulnerable because asleep, and Elkins having had a clear opportunity to cease his attack.

calculated"); eighth in September 2001 ("especially cruel callous," "dispassionate calculated manner," "ugly" and "horrendous" and "very horrible"); ninth in October 2002 ("very cruel" and "exceptionally callous"); and 10th in October 2003 ("especially cruel and callous," "dispassionate and calculated"). On his 11th time (10th subsequent hearing) before the Board, in May 2005, he was finally granted parole, and the Governor has now reversed that decision, once more relying on the gravity of the offense, something that no amount of rehabilitative progress can ever change.

Our case, while resting on state due process (Cal. Const., art. I, § 7, subd. (a)), compares favorably to cases affording habeas corpus relief on federal due process grounds, against parole denials for California inmates with exemplary postoffense records who had been sentenced to terms of at least 15 years to life for second degree murder. In one, the same inmate earlier involved in our Supreme Court's decision in *Rosenkrantz* had offended at age 18, shooting a younger brother's friend who had revealed the inmate's homosexuality to the inmate's intolerant father. The inmate's "perfect prison record" and gains of nearly two decades included, like Elkins's act of jeopardizing his own safety to protect a correctional officer, saving the life of a fellow inmate. The court found due process violated when the former Board of Prison Terms (BPT) denied parole, as it had before, based solely on the gravity of the commitment offense. (*Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F.Supp.2d 1063, 1065, 1070.) The court reasoned in pertinent part: "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances—after nearly two decades of incarceration and half a dozen parole suitability hearings—violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. [Citations.]" (*Id.* at p. 1084.) "Furthermore," the court reasoned, "the general unreliability of predicting violence is exacerbated in this case by several facts, including petitioner's young age at the time of the offense, the passage of nearly twenty years since that offense was committed, and the fact that all of the other evidence in the record clearly indicates that petitioner is suitable for parole." (*Id.* at p. 1085.) The reliability of the facts of the crime as a predictor for his dangerousness was diminished further by his young age of 18, just barely an adult. "The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.]" (*Ibid.*) By comparison, Elkins was 19 years old when he offended and, in these proceedings, had served over 25 years and been denied parole until his 10th subsequent Board hearing.

In a second such case, former Governor Davis had reversed a BPT suitability determination, stressing principally the gravity of the commitment offense. (*Martin v. Marshall, supra,* 431 F.Supp.2d at pp. 1040–1042.) After first finding no support for other grounds (*id.* at pp. 1045–1046), the court turned to the factors surrounding and preceding the offense, which included the 26-year-old petitioner fleeing the scene of his fatally shooting a drug dealer acquaintance and bystander in a blaze of gunfire at a restaurant, wounding yet another bystander, and without seeking medical assistance for any of his victims (*ibid.*). The court reasoned: "[Petitioner] has surpassed his minimum sentence, and has already been found suitable for parole by two decision-making bodies. [¶] . . . [T]he court finds that there was no evidence to support the Governor's reversal of petitioner's parole grant. As the [BPT] found, petitioner has not had a significant disciplinary violation since 1995. He has been in prison for approximately twenty-six years and has taken advantage of numerous rehabilitation and enrichment programs. He has exceeded his minimum sentence by approximately six years. Petitioner's supervisor at the Prison Industry Authority shoe factory documented that petitioner demonstrates 'exceptional teamwork, attitude, and cooperation with staff and co-workers,' and that petitioner is an 'asset, not easily replaced on short notice, if not impossible.' After four panels denied petitioner a release date, he was granted parole at his fifth hearing. The Governor's sole reliance on 'the circumstance of the offense and conduct prior to the offense' [citation], constitutes a due process violation. The court finds no evidence to support any of the Governor's reasons for denying parole, and therefore finds that the Superior Court's denial of [a] petition for habeas corpus was objectively unreasonable." (*Id.* at pp. 1047–1048.) The facts here are certainly no worse, the amount of successful rehabilitation time and parole hearings is greater, and Elkins was only 19 at the time of his offense.

A third instructive case is *Irons v. Warden of California State Prison-Solano* (E.D.Cal. 2005) 358 F.Supp.2d 936 (*Irons*) (app. pending *sub nom. Irons v. Carey* (9th Cir. 2005) 408 F.3d 1165, No. 05-15275), where an inmate serving 17 years to life was found unsuitable for parole at his fifth hearing before the BPT. (358 F.Supp.2d at p. 939.) The facts of the offense were, again, in many respects far worse than those before us. The petitioner killed a fellow boarder after an argument in which the victim denied stealing from the landlords, as the landlords had claimed. The petitioner loaded a handgun, went to the victim's room, fired 12 rounds into him, said he was going to let him bleed to death and, when the victim complained of the pain, took out a buck knife and stabbed him twice in the back. The petitioner later borrowed a car and drove the body to an isolated coastal location where he released it into the surf. (*Id.* at pp. 940–941.) The BPT had relied exclusively on the facts of the commitment offense and the petitioner's drug use at the time. (*Id.* at p. 947.) The court wrote: "[Important] in assessing any due process violation is the

fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. . . . The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial." (*Ibid.*)

"To a point, it is true," the court observed, "the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, the predictive ability of the circumstances of the crime is near zero." (*Irons, supra,* 358 F.Supp.2d at p. 947, fn. 2.)

The facts of the offense here are older than in any of those three cases and less or only equally aggravating, and the rehabilitation successes of this inmate are superior. The Governor's decision reversing the Board's grant of parole on the basis of the facts of the offense lacks "some evidence" that granting parole posed "an unreasonable risk of danger to society" (§ 2402, subd. (a)).[12]

---

[12] We have reached all of our conclusions without resort to an executive case summary (ECS) whose relevance, confidentiality and scope of disclosure have been disputed by the parties throughout these proceedings. The ECS is a memorandum of 16 pages, dated June 23, 2005, prepared by a staff services analyst for the Board after the panel's decision but before the case was forwarded to the Governor for review. The document summarizes much of the record before the Board panel and concludes that various factual findings made by the panel are supported by the record. (See § 2041, subd. (h) [review of life prisoner decision may be reviewed by chief counsel or designee within 110 days, for possible affirmance, modification, new hearing, or referral to full Board; proposed decision of panel becomes final in 120 days].) Although the document was not seen by any Board panel member before the panel made its decision, the ECS was transmitted to the Governor and available to him in his review of the case.

We ordered the ECS divulged to Elkins's counsel (over objections by the Attorney General predicated on relevance and official information privilege (Evid. Code, § 1040)) because of the likelihood the Governor would rely on the document and our concern for Elkins's due process interest in ascertaining its factual accuracy.

Having now granted Elkins relief without resort to the ECS, it is unnecessary to expand or otherwise alter our prior order, as modified from the bench at argument, granting disclosure of the ECS to Elkins's counsel.

## DISPOSITION

The Governor's decision reversing the Board decision granting Elkins parole is vacated. Elkins's petition for habeas corpus is granted. The Board is ordered to release Elkins forthwith pursuant to the conditions set forth in its decision of March 4, 2005. Considering that release by the Board would have been final on June 30, 2005, over a year ago, and in the interests of justice, this opinion shall be final as to this court immediately. (Cal. Rules of Court, rule 24(b)(3).)

Lambden, J., and Richman, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 7, 2007, S148058.