[No. D045848. Fourth Dist., Div. One. Dec. 27, 2005.]

In re GILBERT FUENTES on Habeas Corpus.

**COUNSEL**

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Michelle Des Jardins, Heather Bushman, Collette C. Cavalier, Julie L. Garland and Nicholas N. Paul, Deputy Attorneys General, for Appellant the Board of Prison Terms.

Steven J. Carroll, Public Defender, and Matthew Braner, Deputy Public Defender, for Respondent Gilbert Fuentes.

**OPINION**

**McCONNELL, P. J.**—The Board of Prison Terms (Board) appeals from the superior court order vacating the decision denying Gilbert Fuentes a parole release date. We conclude the trial court erroneously granted relief and therefore we reverse.

## FACTS

### The Commitment Offense

On September 20, 1986, Fuentes met Richard Luken at a friend's house. Luken, who had been recently released from prison, showed off a knife his sister had given to him. Luken accompanied Fuentes to a convenience store. Meanwhile, Kevin Schatzke and Kenneth Redmond, two sailors returning

from a night of drinking at a nearby club, stopped at the same convenience store to buy a six-pack of beer. They left the store shortly after Fuentes and Luken.

According to Schatzke, he and Redmond walked past Fuentes and Luken, who then stopped. Fuentes and Luken started walking again. Schatzke heard the two men coming up fast behind him. He and Redmond turned to confront them. Schatzke swung at Luken, hitting him. Neither Fuentes nor Luken said anything before the confrontation. Schatzke testified he fought briefly with Luken while Redmond fought with Fuentes. Fuentes was able to pull free from Redmond, pulled a knife and stabbed Redmond. Redmond was stabbed once in the face and once in the chest. He later died of the wounds.

Fuentes testified while he and Luken were walking in front of Redmond and Schatzke, who were laughing and talking, Luken was angry and said "he didn't go for that shit." Luken wondered out loud if the "punks" had any money. Fuentes told him he had lots of money because he had recently separated from the Navy and cashed a $1,600 check. Luken responded it was not his money.

Fuentes and Luken passed by their friend's house but Fuentes continued to walk with Luken. Fuentes was not sure what Luken wanted to do, maybe start a fight or maybe try to take some money from someone. Fuentes hoped Luken was just heading toward a local bar. Luken said, "Let's go back." They turned and were walking past Schatzke and Redmond when Luken exchanged loud words with Redmond and then punched him. Fuentes and Schatzke watched as the two other men fought. When Schatzke jumped on Luken's back, Fuentes kicked him off Luken because Fuentes "figured if they were going to fight it was going to be a fair fight, it was going to be a one on one fight." Redmond and Luken stood up. There was more yelling. Luken pulled a knife and stabbed Redmond in the face. Fuentes ran to his friend's house and told the friend Luken was in a fight and covered with blood.

A woman at the friend's house testified she saw Fuentes return, set something that looked like a knife on the couch with his jacket and said Luken had been in a fight. She did not recall seeing any blood on the knife or Fuentes's clothing. Another person in the house testified Luken had a knife with him when he returned with Fuentes and that Luken told him someone had jumped them.

A neighbor, who heard loud voices, looked out his window and saw the fight. Initially, he thought Fuentes had stabbed the victim but later he believed Luken had committed the stabbing.

Luken's sister testified Luken and Fuentes came to her apartment the next morning. Fuentes had blood on his pants and was not wearing a shirt. Luken told her Fuentes had tried to roll a guy who turned on him and fought. Luken said he had stabbed the victim but later Fuentes told the sister he had been the one who stabbed the victim and reenacted the crime, including creeping up behind the victim. This conflicted with Schatzke's testimony that Lukens and Fuentes had run up from behind.

Fuentes left San Diego. He was arrested 11 months later. He told the police that Luken had said he wanted to "roll" the two men. Fuentes claimed his only involvement was kicking Schatzke and making sure the fight stayed fair.

The jury found Fuentes guilty of first degree felony murder based on an attempted robbery. (Pen. Code, § 187.) The jury made a not true finding on the allegation Fuentes had personally used a knife. (*Id.*, § 12022, subd. (b).) He was sentenced to a prison term of 25 years to life. His minimum eligible date for parole was April 9, 2004.

*Criminal History*

Fuentes had a few traffic tickets. In June 1984, while on active duty in the Navy, he was arrested for receiving stolen property and drug paraphernalia but he was not prosecuted. His division officer in the Navy warned him to stay away from people who used drugs. In February 1986, he was arrested for possession of a controlled substance but was not prosecuted. He was court martialed, fined, and demoted by the Navy. In December 1986, Fuentes was again arrested for possession of a controlled substance. Following his arrest, Fuentes was absent without leave for the Navy for 19 days because he was ashamed he had disappointed his superior officer. Eventually, Fuentes was court martialed, demoted and fined, and he received a bad conduct discharge from the Navy.

*Incarceration*

Fuentes's prison term began in January 1989.

While incarcerated, Fuentes was once disciplined in 1989 for manufacturing alcohol. On one occasion in 1995 he had been late in returning from a "recall on the yard."

He had participated in Narcotics Anonymous continuously since 1997. He had been both the vice-chairman and sergeant at arms at the Narcotics Anonymous group. When asked at the parole hearing whether he was working on any of the steps, he responded he had "actually worked them over several times" but was not currently working on any step. Additionally, while in prison, Fuentes had completed both the basic and advanced "Alternatives to Violence" workshops, taken an intensive journaling class, taken three college classes, was taking a college level history class, and had signed up for an anger management class.

Fuentes worked as a stationary engineer in the kitchen maintenance shop and had received good reports stating he was a very good worker, dependable, prompt, and a self-starter.

*Psychological Evaluation*

The psychological report, dated January 13, 2003, listed several factors in support of a finding Fuentes's chances of recidivism were low. The psychologist assessed Fuentes's level of dangerousness within the controlled setting of the prison as being "low and definitely below[]average." His level of dangerousness if released to the community was also seen as low if Fuentes was able to remain clean and sober, which the psychologist believed was "very likely" given Fuentes's support system and parole plans.

*Parole Hearing*

The parole hearing was held in March 2003.

Fuentes submitted several letters from relatives and family friends in support of granting parole. These letters, inter alia, indicated his parents had offered a place to stay and he had more than one offer of employment.

A deputy district attorney from San Diego opposed parole, arguing "the commitment offense was a crime of great violence, cruelty, and callousness to human life," Fuentes failed to help the victim or turn himself in after the crime, he had a long-term drug use going back to age 14, the victim's wife was five months pregnant at the time, and Redmond's son never had the opportunity to meet his father.

During the hearing, Fuentes expressed his love for the Navy and his shame in disappointing his superior officer. He wished he had "made the right decisions," noting he could have retired that year with 20 years' service if he had remained with the Navy. He expressed remorse for being involved in the death of the victim. In describing the crime, Fuentes told the Board that as he and Luken had walked by the friend's house, he said, "Let's go in." Luken responded, "No, I'm going to go check these dudes out" and Fuentes kept walking with him, "a mistake." Luken and Fuentes walked toward Redmond and Schatzke and confronted them, with Luken striking the first blow at Redmond. Fuentes intervened when Schatzke jumped on Luken's back, kicking him off. Fuentes looked over and saw Luken stab Redmond. He was ashamed of what he had done and ashamed for his family and the Navy.

### The Board's Decision

The Board concluded Fuentes was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison" because "the offense was carried out in an especially cruel manner," the victim was "abused in that he was stabbed in the face and stabbed in the chest," the manner of the offense demonstrated a "lack of respect for another human," and "[t]he motive for the crime was inexplicable" or "[a]t the very least, it was very trivial."

The Board noted Fuentes had no history of violence and "a minimal criminal history." The Board, however, also noted Fuentes had "failed to profit from the [N]avy's attempt to correct his prior criminality," that is, his substance abuse—"[t]he [N]avy gave him the opportunity to refrain and gave him the opportunity to remain in the [N]avy. And [Fuentes] blew it, . . . and went out and used additional drugs," resulting in a court martial and being discharged from the Navy.

The Board also recognized Fuentes had a stable social history (with the exception of his drug use), his level of dangerousness, both inside and outside of prison, was reduced, he had some parole plans, and he possessed marketable job skills. The Board recommended Fuentes "intensify his level of involvement in self-help" and other positive programs. The Board concluded Fuentes had not made sufficient progress and still posed some measure of threat to society if released.

### Superior Court

Fuentes filed a petition for a writ of habeas corpus.

In its order to show cause, the court noted the "Board did not expressly find that the commitment offense was particularly egregious," but "[i]nstead . . . found that 'the offense was carried out in an especially cruel

manner, . . . [and] in a manner that shows disregard for another human being,' " citing the fact the victim was stabbed in the chest and face and the motive was inexplicable or very trivial. The court noted this language was derived from the California Code of Regulations, title 15, (Regulations), section 2402, subdivision (c)(1), which lists factors tending to show unsuitability for parole based on the commitment offense was committed in an "especially heinous, atrocious or cruel manner." The court observed, "Robberies are violent offenses and involve great risk of injury to its victims and the Court is unable to conceive of any robbery whose motivation would not be inexplicable or trivial in relation to the offense," and the stabbings had been committed by Luken, not Fuentes. The court noted the Board had referred to Fuentes's "minimal criminal history" in support of its decision to find him unsuitable for parole but failed to recognize lack of any significant history of violent crime is a factor *favoring* parole. The court found nothing in the record to support the Board's finding that Fuentes needed to intensify his involvement in self-help programs before he could be safely released on parole. The court in the order to show cause concluded: "[T]he Board's unsupported use of the regulatory language suggests an attempt to justify an arbitrary decision to deny parole rather than the reasoned consideration of the factors set forth in Section 2402 to which [Fuentes] is entitled. As the factors relied upon by the Board to establish unsuitability for parole do not appear to be supported by any evidence, the Board's determination that the positive aspects of [Fuentes]'s behavior do not outweigh those cited by it in denying parole is also called into question."

The court granted Fuentes's petition. The court noted that the Board had found Luken, not Fuentes, had stabbed the victim[1] and therefore parole could not be based on facts relating to Luken's acts in stabbing the victim, but on Fuentes's acts. The court found there was no evidence to support the Board's conclusion the commitment offense justified denying parole. The court also found the Board had erred in considering Fuentes's criminal history as supporting a finding of unsuitability since the Regulations provide a prisoner's lack of any significant history of violent crime, as was the case here, is a factor favoring parole.

We issued a stay on March 4, 2005.

---

[1] The Board, in describing the facts of the commitment offense, stated: "Two individuals walking home from a party or whatever they [were] doing there. And they decided to stop at a [convenience] store. And they were encountered by the prisoner and his crime partner. An altercation ensued, and his crime partner pulled out a knife and stabbed Mr. Redmond. . . ."

## DISCUSSION

### Relevant Law

■ The Board has very broad discretion to identify and weigh the factors relevant to predicting "by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) "When a decision by the Board denying parole is challenged, 'the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation.' [Citation.] 'Only a modicum of evidence is required.' " (*In re DeLuna* (2005) 126 Cal.App.4th 585, 591 [24 Cal.Rptr.3d 643]; *Rosenkrantz, supra,* at pp. 658, 677.) "If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz,* at p. 658.)

■ In *Rosenkrantz,* the Supreme Court recognized the nature of the commitment offense alone may be a sufficient basis for denying a parole application. (*Rosenkrantz, supra,* 29 Cal.4th at p. 682.) The court, quoting *In re Ramirez* (2001) 94 Cal.App.4th 549, 570 [114 Cal.Rptr.2d 381], stated, " 'a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.' " (*Rosenkrantz, supra,* at p. 683.) The *Rosenkrantz* court also stated, "In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation—for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense." (*Ibid.*)

■ In *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783], the Supreme Court clarified the applicable standard. The Supreme Court rejected the analysis of the Court of Appeal holding "that once an indeterminate life prisoner reaches minimum parole eligibility, the Board must set a fixed date for parole release, pursuant to the principle of 'uniform terms' for crimes of similar gravity, and with due regard for the statutory minimum term for the inmate's offense, unless it finds the prisoner's crime 'particularly egregious' in comparison to other offenses of the same class." (*Id.* at p. 1070, italics omitted.) The Supreme Court held "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum

prisoner's crime individually. While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*Id.* at p. 1071, italics omitted.) The court recognized that an inmate cannot "be imprisoned beyond a period that is constitutionally proportionate to the commitment offense or offenses," however noted "that limitation will rarely apply to those serious offenses and offenders currently subject by statute to life-maximum imprisonment." (*Ibid.*, italics omitted.) The court concluded "[i]ts potential application in occasional individual cases does not require the [Board], under the current statutory scheme, to set fixed release dates for all life prisoners except those whose crimes are most 'egregious' compared to others of the same class. Instead, the Board may decline to do so in an individual case if it concludes, on relevant grounds with support in the evidence, that the grant of a parole date is premature for reasons of public safety." (*Ibid.*)

Regulations, section 2402, subdivision (c)(1) sets out factors that may be considered in determining whether the commitment offense was committed in an "especially heinous, atrocious or cruel manner . . . :

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense."

*Analysis*

The trial court concluded the Board had no factual basis to support its conclusion the commitment offense and Fuentes's criminal history justified denying parole. We disagree.

The trial court, in its order to show cause, criticized the Board's failure to describe the commitment offense as particularly "egregious." Instead, the Board described the commitment offense as being "carried out in an especially cruel manner, . . . [and] in a manner that shows disregard for another human being." The trial court observed this language derived from Regulations, section 2402, subdivision (c)(1). The trial court believed the Board used the statutory language in "an attempt to justify an arbitrary decision to deny parole," rather than engaging in a "reasoned consideration" of the relevant factors. To the extent the court placed any weight on the Board's use of the phrase "cruel manner" rather than the word "egregious," the court erred; both have similar meanings and may be used interchangeably. Nor do we find any significance to the Board's use of any other language contained in the regulation to describe its findings about the commitment offense.

We find some merit to the court's criticism of the Board's reliance on the fact the victim was stabbed in the face since, as the trial court pointed out, the Board had concluded Luken, not Fuentes, committed the stabbing. Nonetheless, the fact remains that this robbery involved multiple stabbings, Fuentes knew Luken was armed with a knife and did nothing to intervene or assist the victim. Instead, Fuentes kept the victim's companion from intervening and fled after the stabbing.

The trial court, in its order to show cause, criticized the Board's reliance on a finding Fuentes's motive for participating in the crime was "inexplicable" or "very trivial." In rejecting this reason, the trial court explained: "Robberies are violent offenses and involve great risk of injury to its victims," and it was "unable to conceive of any robbery whose motivation would not be inexplicable or trivial in relation to the offense." We find the trial court's analysis perplexing.

Robberies are typically motivated by a desire to obtain money or property, a motive that appears far from inexplicable or trivial to the robber who believes he or she needs the money or property. Even law-abiding citizens can understand this motive and, given a dire enough need, for example, for medicine for a sick child, might be willing to engage in a robbery. Further, while robberies are violent offenses, requiring the application of force or fear against the victim, most robberies do not result in physical harm or death to the victim nor do most robbers plan to physically harm their victims. Nor do robbers generally believe they will be caught. Thus, in the mind of the robber, the desire for the money or property may easily outweigh the risks related to the offense.

■   Here, Fuentes himself could not explain why he committed the crime, other than noting he had been young and immature and made "poor decisions." He had been paid that day or the day before and had plenty of money. Luken was not a close friend; Fuentes had met Luken only that day. Redmond and Schatzke were strangers with whom neither Fuentes nor Luken had had any prior interaction. Fuentes easily could have avoided any confrontation by going into his friend's house instead of continuing to walk with Luken. Fuentes's participation was thoughtless. His motive was inexplicable or trivial. The Regulations specifically recognize an inexplicable or trivial motive for committing the offense tends to show the commitment offense was committed in an "especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1)(E).)

The trial court also criticized the Board's reliance on Fuentes's criminal history, noting a prisoner's lack of any significant history of violent crime is a factor favoring parole. (Regs., § 2402, subd. (d)(6).) The trial court mischaracterized the Board's concern. The Board recognized Fuentes had no record of previous violence and his criminal history was "minimal." However, the Board also observed Fuentes had had several "brushes with the law" that included receiving stolen property and drug possession where he was arrested but not prosecuted.

After his first arrest for drug possession, Fuentes had been given a second chance by the Navy but nonetheless continued to engage in criminal conduct. As the Board noted, "The [N]avy gave him the opportunity to refrain [from abusing drugs] and gave him the opportunity to remain in the [N]avy. And [Fuentes] blew it . . . and used additional drugs," resulting ultimately in his discharge from the Navy. There was also evidence before the Board indicating Fuentes had taken drugs on the day of the murder, after he had already received his second court martial and papers indicating the Navy was seeking to discharge him. It is evident the Board's concern was not that Fuentes's criminal history was violent or extensive but that it showed Fuentes had been given opportunities to reform his conduct, to deal with his substance abuse, and to remain in the Navy, and he had not availed himself of those opportunities but had instead engaged in further criminal conduct. The repetitive and recidivist nature of his conduct—his failure to heed wake-up calls and the opportunities he was given—was a legitimate factor for the Board to weigh in favor of a denial of parole.

We find there was some evidence, based on the nature of the commitment offense and Fuentes's prior criminality, to support the Board's denial of parole.

## DISPOSITION

The order is reversed. The stay issued on March 4, 2005, is vacated when the opinion is final as to this court.

Benke, J., and Aaron, J., concurred.

The petition of respondent Gilbert Fuentes for review by the Supreme Court was denied April 12, 2006, S140946. Werdegar, J., did not participate therein.