[No. C057249. Third Dist. Feb. 10, 2009.]

In re TIMOTHY ELLIS ROSS on Habeas Corpus.

1492

## Counsel

Michael Satris, under appointment by the Court of Appeal, for Petitioner Timothy Ellis Ross.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and Amy Daniel, Deputy Attorneys General, for Respondent State of California.

## OPINION

**SCOTLAND, P. J.**—In November 1984, when he was 27 years old, Timothy Ellis Ross (defendant) and another man decided to rob Kelly Marshall (the victim). Defendant beat the victim into unconsciousness and then, with the other man's help, threw the victim, "head first, face down," over an embankment after they took his wallet and his boots. The victim's dead body was discovered the next day. A citizen's tip led to defendant's arrest and his guilty plea to second degree murder. He was sentenced to an indeterminate term of 15 years to life in state prison.

In May 2006, the Board of Parole Hearings (the Board) found that defendant was suitable for parole; however, in October 2006, the Governor reversed the Board's decision to release defendant on parole. Acknowledging defendant's rehabilitative efforts in prison, his positive evaluations by mental health and correctional professionals, and his work plans and relationships with family and friends if released on parole, the Governor found that defendant's criminal history, the "extremely brutal and callous" nature of the murder, and his misconduct in state prison, including threatening prison staff, demonstrated that despite his rehabilitative efforts, his release would pose an unreasonable risk of danger to society.

On December 21, 2006, this court denied defendant's petition for writ of habeas corpus (*In re Ross*, C054378) because the petition did not show that he had first sought relief in the trial court. (Cal. Rules of Court, former rule 60(d)(2) ["A Court of Appeal must deny without prejudice a petition for writ of habeas corpus that challenges the denial of parole or the petitioner's suitability for parole if the issue was not first adjudicated by the trial court that rendered the underlying judgment."]; now rule 8.385(c)(2).)

Defendant petitioned for review by the California Supreme Court, which directed us to issue an order to show cause, returnable before the Shasta County Superior Court, ordering the Director of Corrections and Rehabilitation to show cause "why the Governor did not abuse his discretion in reversing the Board of Parole Hearings' May 2006 determination that [defendant] was suitable for parole, and why [defendant] remains a danger to public safety." We, of course, complied with the Supreme Court's directive.

The superior court denied the petition for writ of habeas corpus, ruling the Governor's decision was supported by defendant's criminal history and the nature of his crime.

Defendant filed the present petition for writ of habeas corpus (case No. C057249) on October 30, 2007. This court issued an order to show cause

on February 7, 2008. Thereafter, the California Supreme Court decided *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (hereafter *Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573], clarifying its decisions in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (hereafter *Rosenkrantz*) and *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] and the limits on the Governor's broad discretion to deny parole. We asked the parties to submit supplemental briefing addressing those decisions. They have done so.

As we will explain, defendant's especially heinous, atrocious, or cruel method of murdering the victim; his prior acts of violence; his subsequent threats to prison staff after incarceration; and a psychologist's opinion that defendant "continues to exhibit dependent features and an exaggerated need for acceptance" (a mental state that had contributed to his history of violent crime) are some evidence supporting the Governor's finding that defendant was unsuitable for parole in 2006.

■ However, *Lawrence* leads us to conclude the Governor's written decision is flawed because it does not contain a more explicit "articulation of a rational nexus between th[e] facts and current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1227.) Following a summary of facts tending to show unsuitability for parole and those tending to show suitability, the decision simply states: "[A]fter carefully considering the very same factors the Board must consider, I find that the negative factors weighing against [defendant's] parole suitability presently outweigh the positive ones."

We cannot fault the Governor for not being more specific. This is so because a similar explanation of a denial of parole was approved in *Rosenkrantz*, where a Governor's decision stated without specificity that the inmate's " 'institutional behavior does not outweigh the circumstances of the crime in assessing his suitability for parole' " and that the gravity of the inmate's offense and other circumstances " 'outweigh the arguments advanced for release, such as . . . his prison record or his parole prospects.' " (*Rosenkrantz, supra*, 29 Cal.4th at p. 682.)

However, after the Governor's denial of parole in this case, *Lawrence* found wanting an earlier Governor's decision that set forth the competing facts and concluded " 'the factors weighing against [petitioner's] parole suitability presently outweigh the positive ones tending to support it. Accordingly, because I continue to believe that her release from prison would pose an unreasonable risk of danger to society, I REVERSE the Board's 2005 decision to grant parole . . . .' " (*Lawrence, supra*, 44 Cal.4th at pp. 1200–1201.)

Because *Lawrence* requires more of an explanation than did *Rosenkrantz*, which was the controlling law when the Governor made the parole decision in this case, we conclude that the appropriate disposition is to remand this case to the Governor for further proceedings consistent with the standards articulated in *Lawrence, supra*, 44 Cal.4th 1181.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant has a criminal history dating back to 1975. From 1975 to 1983, he was convicted in 11 cases for crimes that included petty theft and vandalism in 1975; burglary and vehicle theft in 1975; public fighting, maliciously disturbing someone by loud and unreasonable noise, or using offensive words inherently likely to provoke an immediate violent reaction in 1975; assault with a deadly weapon in 1975; grand theft in 1978; battery in 1980; and a 1982 assault with an automobile, for which he was convicted of assault with a deadly weapon in 1983.

Although he served time in jail for some of his offenses from 1975 to 1983, he was never committed to prison—instead, he received the benefit of probation. This changed when defendant committed second degree murder in 1984. Because he pled guilty to the offense, the facts of the murder are taken from the probation report.

Defendant and an associate named Friggo met the murder victim in a bar. They drove in the victim's pickup truck to a secluded area. Defendant and Friggo decided to rob the victim and forced him out of the truck during a struggle. Defendant assaulted the victim, giving him "a sound thrashing which eventually rendered the victim unconscious." Defendant and Friggo then took the victim's wallet, removed his boots, and threw him over an embankment, "head first, face down," before leaving in the victim's truck with the victim's wallet and boots.

The next day a man discovered the victim's dead body "lying just as it had landed after being thrown down over the bank." The victim, who had a

---

[1] Following the Governor's reversal of the Board's decision granting parole, the Board held another parole hearing in August 2007, which resulted in a split decision and eventual denial of parole. In a footnote in his traverse, defendant asks us to review and reverse the Board's decision. We decline to do so. The issue was not raised in his petition for writ of habeas corpus and is not properly before us. "To satisfy the initial burden of pleading adequate grounds for relief, an application for habeas corpus must be made by petition, and '[i]f the imprisonment is alleged to be illegal, the petition must also state in what the alleged illegality consists.' [Citation.]" (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].) If the reviewing court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an order to show cause, but "it is limited to the claims raised in the petition and the factual bases for those claims alleged in the petition." (*Id.* at pp. 474–475.)

blood-alcohol content of 0.24 to 0.35 percent, died "most likely" from injuries caused by the assault and from his exposure to the elements. Defendant was apprehended after a lengthy investigation and a tip from the secret witness program. He confessed and pled guilty to second degree murder.

Defendant told the probation officer who was preparing the sentencing report, "I can't really give a statement, if I told what happened I wouldn't look so bad to you but I would look like a rat to others. If I told you part of it[,] it would make me look bad." The probation officer, who was familiar with defendant from prior criminal cases, stated "alcohol turns [him] from a cooperative and reasonable individual into an emotional, volatile, irresponsible and exceedingly dangerous individual under the right circumstances." The probation officer noted that defendant was the type of person who could "be easily [led], influenced or duped" by his companions and who had "a strong desire for acceptance." Describing defendant as a "giant" who had the "strength" of a "bear," the probation officer predicted that "[w]ith the introduction of alcohol and the suggestion of a companion that [defendant] engage in any type of violent or dangerous behavior, there is little question . . . that [defendant] would readily involve himself in any type of assaultive or combative situation, for whatever reason," and that "[a]bsent an absolutely fool-proof means to ensure that [defendant] cannot get his hands on any alcohol, he would have to be considered a threat to the community."

Defendant eventually related his version of the murder as follows:

Defendant, Friggo, and the victim were on the way to purchase marijuana for the victim from the neighbor of defendant's brother. Friggo needed to stop and urinate. After Friggo got out of the truck, the victim pulled out a pistol and began shooting it through an open window. When defendant yelled at him to put the weapon down, the victim turned the gun on defendant and threatened him. Defendant hit the victim, the two men fell out of the truck, and defendant knocked out the victim. Friggo returned and began going through the victim's pockets. They agreed the victim was a "jerk" and removed his boots before tossing his unconscious body over an embankment, so he would have to walk home without any shoes when he awakened. Friggo and defendant then drove off in the victim's truck. Defendant thought he had only knocked out the victim. The next day, defendant's brother went to check on the victim and told defendant the victim was dead. Defendant claimed that his brother told him to get rid of the gun by throwing it over the dam, and that defendant did not realize he "was throwing away the best part of [his] defense at the time."

Defendant began serving his prison sentence in August 1985, with a minimum eligible parole date of December 27, 1994.

During his incarceration, he received four form 115 and two form 128-A writeups for misconduct in prison. (Cal. Code Regs., tit. 15, § 3312 [when an inmate commits misconduct that "is believed to be a violation of law or is not minor in nature," it is reported on a form 115 rules violation report; minor misconduct is documented on a "Form 128-A, Custodial Counseling Chrono"].)

Two of the form 115 writeups involved threats to prison staff. In March 1989, defendant lost credits and privileges for unspecified conduct described as "Threatening staff"; and in December 1991, he lost credits and privileges for unspecified conduct described as "Force/Violence threatened Staff." Apparently, these incidents involved verbal threats only, not actual violent conduct, because a report prepared for a parole hearing in 1999 states that while defendant "had verbal altercations with staff," he had "not been involved in physical violence since his commitment offense." His last form 115 writeup for misconduct in prison was in July 1994, and his last form 128-A writeup for misconduct in prison was in May 1996.

The record indicates that defendant's criminal behavior and lack of steady employment prior to his incarceration stemmed from his abuse of alcohol, which began when he was 13 years old. Defendant admits that alcohol fueled his criminal behavior and his escalating history of crimes, and that he had a serious drinking problem. He has a family history of alcoholism, and both his parents died of alcohol-related problems. To combat the problem, he joined Alcoholics Anonymous (AA) in 1987, has been involved consistently with AA or a Christian 12-step program since that time, and continues to pray for forgiveness.

Psychological evaluations of defendant while in state prison acknowledge that if defendant is unable to remain alcohol free after release on parole, his risk of harm to public safety is "greatly increased." However, the evaluators have opined that there is a high probability defendant will be capable of abstaining from alcohol if paroled, given his religious conversion, his motivation and dedication to sobriety, his participation in AA since 1987, his completion of several self-help therapy groups, his insight and awareness of a family propensity for alcoholism, and the support of other family members.

The evaluators also noted that defendant's prison behavior changed for the positive in 1991, which coincided with his religious conversion, and that he has used knowledge gained through a conflict resolution program to assist other inmates in diffusing arguments in a nonviolent manner.

In 2000, correctional counselors concluded that defendant posed a low to moderate threat to the public safety. In 2004, he was viewed as a low threat of harm. And in 2005, they opined that there were "no foreseeable problems with his parole plans." Defendant's mental health evaluations were positive, in 1999 indicating his potential for violence was comparable to that of the average male in the free community, and later concluding he presented only a low risk of violence if released.

Defendant's most recent psychological evaluation, prepared in December 2004, states the following: He has insight regarding his criminal behavior, takes blame for his role in the murder, and "does not appear to utilize . . . psychological defense mechanisms of denial or rationalization." His criminal behavior was influenced by alcohol, but his alcohol dependence is in "full sustained remission" and he has gained "proper coping skills to confront [his] addiction problems upon release." He completed numerous self-help therapy groups, had no disciplinary rules infractions for a long time, and had "increasingly become a good law abiding inmate." His religion gives him moral guidance, and he has a place to live, support from his fiancée, and an offer of employment upon release. If defendant "is provided with a stable living environment and employment," "does not associate with negative individuals or use alcohol or other drugs," and "continues with his religious devotion and adherence to the morals he is advocating presently, he should be well ready to face society." In sum, he "appear[ed] to show a low risk of dangerousness and violence if released to the public at this time."

The life prisoner evaluation report prepared in 2005 notes defendant worked in the vocational landscaping program, received satisfactory reports from his work supervisor, completed the "Mill & Cabinet" vocational trade program, and had two offers of employment if released on parole. He intended to live with his sister and her family, or to accept an offer of placement at the End Time Ministries. The director of the ministries had written a letter of support on behalf of defendant, who received numerous other letters of financial, emotional, and spiritual support. According to the correctional officer preparing the report, "[t]here are no foreseeable problems with [defendant's] parole plans."

At the parole hearing in May 2006, defendant reiterated his remorse and stated that during the 22 years since the murder, he had matured, accepted responsibility for what he had done, and embraced God to change his life.

The Board granted parole, noting that defendant had addressed his alcoholism; had participated in vocational programs; had only a minimal disciplinary history, with the last infraction occurring in 1994 and none of the infractions involving the use of violence; and had consistently followed previous rehabilitation recommendations given by the Board.

The Governor reversed the Board's decision. After recounting the facts of the murder committed by defendant and his disciplinary history in prison "for threatening staff, disrupting the hospital unit, fighting, and participating in a work strike," and later summarizing defendant's criminal record prior to the murder, the Governor considered all the positive factors (summarized above) that favored suitability for parole. The Governor found that "[d]espite the positive factors," the "extremely brutal and callous" nature of the murder and defendant's "lengthy adult criminal record" and "criminal history" which includes other "incidents of violent and assaultive behavior" demonstrate that he "would pose an unreasonable risk of danger to society" if he were released on parole in 2006.[2]

## DISCUSSION

### I

The following legal principles guide our review of the Board's decision:

██ One year prior to the minimum eligible parole release date of an inmate sentenced to an indeterminate prison term, the Board must "normally set a parole release date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public . . . ." (Pen. Code, § 3041, subd. (a).) The Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).)

---

[2] The Governor stated the "gravity of the second-degree murder perpetrated by [defendant] is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk"; nonetheless, the Governor went on to also place reliance on defendant's "adult criminal record" and "criminal history."

■ The Board is required to "establish criteria for the setting of parole release dates." (Pen. Code, § 3041, subd. (a).) A panel of the Board must determine whether the life prisoner is suitable for release on parole, and "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a); further section references are to title 15 of the California Code of Regulations unless otherwise specified.)

The Board's regulations set forth nine factors tending to show suitability for release on parole: (1) the absence of a juvenile record; (2) a history of reasonably stable social relationships with others; (3) tangible signs of remorse; (4) the commission of the crime resulted from significant stress, especially if the stress had built over a long period of time; (5) battered woman syndrome; (6) a lack of a history of violent crime; (7) increased age, which reduces the probability of recidivism; (8) marketable skills and reasonable plans for the future; and (9) responsible institutional behavior. (§ 2402, subd. (d).)

■ Factors tending to demonstrate unsuitability for release on parole include the inmate's (1) commission of the offense in an especially heinous, atrocious, or cruel manner; (2) previous history of violence; (3) unstable social history; (4) prior sadistic sexual offenses; (5) lengthy history of mental problems; and (6) serious misconduct in prison or jail. (§ 2402, subd. (c).)

The importance of those factors is left to the discretion of the parole panel (§ 2402, subds. (c), (d)), and judicial review of the Board's parole decisions is very limited. "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

■ However, the deferential review accorded the Board's decision does not mean that courts simply rubber-stamp its determination as long as there is

some evidence to support any of the unsuitability factors; the "standard is unquestionably deferential, but certainly is not toothless." (*Lawrence, supra,* 44 Cal.4th at p. 1210.) Rather, the reference in *Rosenkrantz* to some evidence to support the Board's decision to deny parole means its ultimate decision that the inmate poses a current risk of danger to society if released from prison. (*Lawrence, supra,* 44 Cal.4th at pp. 1210, 1212; see also *In re Lee* (2006) 143 Cal.App.4th 1400, 1408 [49 Cal.Rptr.3d 931]; *In re Tripp* (2007) 150 Cal.App.4th 306, 313 [58 Cal.Rptr.3d 64].)

■ Accordingly, "to give meaning to the statute's directive that the Board *shall normally* set a parole release date ([Pen. Code,] § 3041, subd. (a)), a reviewing court's inquiry must extend beyond searching the record for some evidence that the commitment offense was particularly egregious and for a mere *acknowledgement* by the Board or the Governor that evidence favoring suitability exists. Instead, under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra,* 44 Cal.4th at p. 1212, original italics.)

There must be something "more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness. 'It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.' [Citation.]" (*Lawrence, supra,* 44 Cal.4th at p. 1210.)

■ With respect to the aggravated circumstances of the commitment offense, "the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1211.) In other words, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-

incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Id.* at p. 1214, original italics.)

Thus, "the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. [Citation.] Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense. Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude. [Citations.]" (*Lawrence, supra*, 44 Cal.4th at p. 1221.)

In reviewing the Board's finding, " 'the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision' "; but "the Governor undertakes an independent, de novo review of the inmate's suitability for parole [citation]." And the Governor "has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety. [Citation.]" (*Lawrence, supra*, 44 Cal.4th at p. 1204.)

In sum, "the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Lawrence, supra*, 44 Cal.4th at p. 1221, original italics.)

## II

A "[c]ircumstance[] tending to indicate unsuitability" for release on parole is the inmate's commitment of the crime "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1); Pen. Code, § 3041, subd. (b)

["gravity of the current convicted offense"]); the factors to be considered include whether the crime "was carried out in a dispassionate and calculated manner"; whether it "was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering"; and whether the "motive for the crime [was] . . . very trivial in relation to the offense" (§ 2402, subd. (c)(1)(B), (D), (E)).

Defendant contends the Governor's reliance on the gravity of the commitment offense does not support denial of parole because "there is no evidence that [the] murder was an especially heinous, atrocious or cruel one within the meaning of the pertinent regulation, and thus cannot constitute a 'particularly egregious' murder that demonstrates his unsuitability for parole." As he sees it, "the drunkenness of [defendant] and [the victim] at the time indicates there was little considered action between them. [Defendant], weaponless, fought to disarm [the victim], who had a gun and was acting belligerent[ly] with it; [defendant's] assault rendered [the victim] unconscious. [His] crime, even taking account of the fact that he left [the victim] in that state, pales in callousness and brutality when compared to other murders where [a] Court found a Governor['s] reversal [of a suitability for parole finding] to be unsupported by some evidence." We are not persuaded.

 Taking his last point first, "whether a petitioner's crime was 'particularly egregious' in comparison to other murders in other cases is not called for by the statutes, which contemplate an individualized assessment of an inmate's suitability for parole, nor is it a proper method of assessing whether 'some evidence' supports the Governor's conclusion that a particular inmate represents an unreasonable threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1217.) In other words, courts do not engage in "comparative analysis"; the "circumstance that some inmates who committed murders were or were not adjudged to be threats to public safety has a minimal bearing upon whether any *other* inmate poses such a threat." (*Ibid.*, original italics.)

And the Governor, and thus we, need not view the offense in the self-serving manner in which defendant characterizes it. Indeed, there is no evidence in the record to support defendant's fanciful claim that his beating the victim into unconsciousness was in response to the victim pulling out a pistol, shooting it through the open window of the truck for no apparent reason, and turning the gun on defendant, and that defendant—a "giant" with the "strength" of "a bear"—and his accomplice took the victim's boots simply because they agreed he was a "jerk" and they wanted him to have to walk home without any shoes after he regained consciousness. Instead, the evidence supports a reasonable inference that defendant and his accomplice met the intoxicated victim in the bar where they were drinking together, and then took advantage of the victim's vulnerable state (his intoxication) to lure

him to come with them in his truck so they could drive to an isolated location, beat him into unconsciousness to steal his money, then dump his body, "head first, face down," over an embankment out of sight, and leave him there to die.

This latter scenario, supported by the evidence, leads to a reasonable finding that (1) the motive for killing the victim (to steal his wallet and boots) was a "very trivial" reason to kill him (§ 2402, subd. (c)(1)(E)), (2) the murder was carried out in a manner demonstrating "an exceptionally callous disregard for human suffering" (§ 2402, subd. (c)(1)(D)), and (3) the murder was carried out "in a dispassionate and calculated manner" (§ 2402, subd. (c)(1)(B)), such that it was an "especially heinous, atrocious *or* cruel" murder (§ 2402, subd. (c)(1), italics added); "heinous" means "shockingly evil: grossly bad"; "atrocious" means marked by "extreme wickedness," "brutality or cruelty"; "cruel" means "disposed to inflict pain," especially in a way indicating enjoyment in the infliction of "pain or misfortune" (Webster's 3d New Internat. Dict. (1986) pp. 139, 546, 1050)).

Defendant argues that "[e]ven if the evidence permitted a finding that the murder was an especially heinous, atrocious [or] cruel one," it was "irrational for the Governor to conclude that [defendant's] offense, even when considered in conjunction with his prior criminality," tends to indicate his "unsuitab[ility] for parole." Again, we are not persuaded.

The murder was committed 22 years prior to the Governor's decision to deny parole. In defendant's view, the remoteness of the murder he committed in what can be said to have been especially heinous, atrocious, or cruel manner, and the remoteness of his "prior criminality that was even older than his murder," "discount[] the reliability of the commitment offense as an indicator of present dangerousness . . . ."

It is true that "the predictive value of the commitment offense may be very questionable after a long period of time . . . ." (*In re Scott* (2005) 133 Cal.App.4th 573, 595 [34 Cal.Rptr.3d 905]; see also *Lawrence, supra,* 44 Cal.4th at pp. 1219–1220 [the passage of time is "highly probative to the determination of current dangerousness"], 1215, 1228; *In re Elkins* (2006) 144 Cal.App.4th 475, 498, 500 [50 Cal.Rptr.3d 503].)

But when the inmate has a history of other acts or threats of violence, the inmate's threat to public safety, as demonstrated by the commitment offense and his other violent or threatening behavior, does not necessarily diminish simply because of the passage of time. Indeed, common experience has shown that the "collective behavior" of parolees "demonstrates the truth of the axiom that past behavior is the best predictor of future behavior." (*U.S. v. Crawford* (9th Cir. 2004) 372 F.3d 1048, 1071 (conc. opn. of Trott, J.).)

Here, unlike in *Lawrence* for example, the murder was not the only violent act committed by defendant. Among his convictions in 11 criminal cases prior to the murder, defendant was found guilty of assault with a deadly weapon in 1975, battery in 1980, and a 1982 assault with an automobile. Most of those crimes were committed by defendant after he received the benefit of probation, thus reflecting his "failure to heed wake-up calls and the opportunities he was given." (*In re Fuentes* (2005) 135 Cal.App.4th 152, 163 [37 Cal.Rptr.3d 426].) And even his incarceration for the murder initially did not deter him from threatening prison staff in 1989 and again in 1991.

Under the circumstances presented by what the Governor found was an especially heinous, atrocious, or cruel method of murder, his prior acts of violence, and his threats to prison staff after he was incarcerated for murder, it was not irrational to conclude that defendant's predilection to harm others had not evaporated *simply* because of the passage of time during his incarceration in a controlled setting that limits the opportunities and advantages of continuing to engage in harmful behavior. (See *In re Fuentes, supra*, 135 Cal.App.4th at p. 163 ["The repetitive and recidivist nature of [an inmate's] conduct—his failure to heed wake-up calls and the opportunities he was given—[is] a legitimate factor . . . to weigh in favor of a denial of parole."].)

Stated another way, despite the passage of time, the especially heinous, atrocious, or cruel method of murder, coupled with his prior acts of violence and threats to prison staff after incarceration, was some evidence that defendant would be a danger to public safety if he were released on parole in 2006.

Thus, we turn to the Governor's finding that the circumstances tending to show defendant's suitability for parole did not "outweigh" the circumstances tending to show his unsuitability for parole and that (as reflected by the manner in which defendant committed murder, had engaged in other violent acts prior to the murder, and had made threats to prison staff after the murder) defendant would have posed an unreasonable risk of danger to society if granted parole in 2006.

Defendant emphasizes that his bad acts, at least before his incarceration in state prison, were "inextricably entwined with his alcoholism" and asserts his "post-conviction record shows that he has fully addressed his alcoholism, is highly unlikely to relapse, and has internalized the coping skills and pro-social attitudes required to maintain his sobriety." He further emphasizes that "he has for many years had positive psychological evaluations that assessed him as a low risk of danger if released; and he has obtained vocations and participated extensively in AA/12-step programs and other self-help, as well

as his religion. . . . [In addition] he . . . has shown tremendous remorse and insight into the offense and its causative dynamics." According to defendant, he has also "developed and internalized pro-social, non-criminal and non-violent attitudes and behavior. He has very good parole plans."

We have examined the record, as we presume the Governor did (Evid. Code, § 664), to identify specific information and opinions about the effect defendant's rehabilitative efforts have had on his suitability for parole. It is readily apparent from the records that defendant's ability to avoid any negative influences from others and to abstain from alcohol were the critical questions regarding whether he would pose an unreasonable risk to public safety if released on parole. This is understandable because the probation department report which evaluated defendant for sentencing for murder observed that, in the past, defendant has been "easily [led], influenced or duped, and seems to exhibit a strong desire for acceptance" and that the consumption of alcohol has, in the past, "turn[ed] [defendant] from a cooperative and reasonable individual into an emotional, volatile, irresponsible and exceedingly dangerous individual under the right circumstances. . . . With the introduction of alcohol and the suggestion of a companion that [he] engage in any type of violent or dangerous behavior, . . . [defendant] would readily involve himself in any type of assaultive or combative situation, for whatever reason."

Thus, when the most recent evaluations by prison staff opined that defendant would not pose an unreasonable risk to public safety if released on parole, the evaluators based their opinions on the view that (1) defendant's "dedication to sobriety and his apparent success with that commitment" is such that he "appears to represent a low risk to public safety" and (2) with "financial and spiritual assistance offered [to defendant] by family, friends and spiritual advisors," there were "no foreseeable problems with [his] parole plans." The most recent psychological evaluation of defendant opines that he "appears to show a low risk of dangerousness and violence if released to the public," "[i]f he is provided with a stable living environment and employment and [he] does not associate with negative individuals or use alcohol or other drugs," and "[i]f he continues with his religious devotion and adherence to the morals he is advocating presently . . . ."

Those "ifs" and "appears" are reflected throughout evaluations of defendant over time. For example, a psychological assessment in 1998 opined that "[s]ome of the sociopathic features of [defendant's] personality appear to be in burnout as this man gets older" and that the "chances of his being a repeat offender in terms of a violent crime are significantly reduced" "assuming that he abstains from alcohol or drugs," which the evaluator "believed" was "high[ly] probab[le]." And a psychological assessment in 1999 opined that

"[s]hould [he] abstain from alcohol use, his risk to the community is estimated as average for males in the community," but "[s]hould he again use alcohol these risks are greatly increased." That same report noted defendant "continues to exhibit dependent features and an exaggerated need for acceptance."

Of course, the Governor, not prison staff and psychologists, and not us, is the trier of fact as to whether defendant remained a threat to public safety in 2006, considering all the statutory and regulatory factors regarding the nature of his commitment offense and his preincarceration and postincarceration history, including his rehabilitative efforts, current demeanor, mental state, and plans if paroled. (*Lawrence, supra,* 44 Cal.4th at pp. 1191, 1212, 1213, 1214, 1221.) " '[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor.' " (*Id.* at p. 1204.)

Thus, it " 'is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision.' ([*Rosenkrantz, supra,* 29 Cal.4th] at p. 677, italics added.)" (*Lawrence, supra,* 44 Cal.4th at p. 1204.)

Applying this test, we conclude there is some evidence that supports the Governor's finding that defendant presented a current danger to public safety if paroled in 2006.

It is true the Governor stated the "gravity" of the "extremely brutal and callous" murder was "alone" sufficient to find defendant posed a current danger to public safety, whereas the Supreme Court has held "the underlying circumstances of the commitment offense alone *rarely will* provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1211, italics added.) But the record reflects the Governor based his decision on more than just the aggravated nature of the murder; he also cited defendant's preincarceration and postincarceration history (namely, defendant's prior crimes, three of which involved violence, and his postcommitment threats against prison staff) as demonstrating that defendant posed a current danger to society if released on parole in 2006.

As we explained, despite the passage of time, the especially heinous, atrocious, or cruel method of murder committed by defendant, coupled with

his prior acts of violence and his threats to prison staff after he was incarcerated, was evidence that defendant posed a danger to public safety if he were released on parole in 2006.

The question then is whether it was some evidence upon which to deny parole when considered in light of circumstances tending to show defendant's suitability for parole. (*Lawrence, supra,* 44 Cal.4th at p. 1219 [the circumstances of the commitment offense "may continue to be probative of the prisoner's dangerousness for some time in the future"; "[a]t some point, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness"].)

As the Governor explicitly noted, there were a number of "positive factors" reflected by the efforts defendant has made while in state prison "to enhance his ability to function within the law upon release. He took adult basic education courses. He completed vocational training in landscaping, and also in mill and cabinet work. He received additional vocational training in blue-print reading, sewing-machine repair, and baking. He held institutional jobs such as a yard crew worker, porter, loose-leaf bindery worker, and janitor. He also availed himself of an array of self-help and therapy, including the Christian 12-step Program, Nonviolent Conflict Resolution, Group Therapy for Lifers, Alcoholics Anonymous, Narcotics Anonymous, Breaking Barriers, Beginning Stress Management, Bottle Stoppers, Creative Conflict Resolution, the Parolee Recidivist Prevention Program, as well as a therapy group for life-term inmates. He maintains seemingly solid relationships and close ties with supportive family and friends, and received some positive evaluations from mental-health and correctional professionals over the years. He also made plans to live and work with a family in Shasta County, the county of [his] last legal residence."

However, unlike in *Lawrence,* the positive factors regarding defendant's rehabilitative efforts and current mental state are *not* "devoid of any evidence" that he would pose a risk of danger to the public if released on parole in 2006. (See *Lawrence, supra,* 44 Cal.4th at p. 1227.) The last psychological evaluation that addressed a critical issue regarding defendant's mental state while incarcerated opined that he "continues to exhibit dependent features and an exaggerated need for acceptance." It was this same mental state which contributed to his violent crimes prior to and including the murder. As noted in the probation report prepared for his sentencing for the murder, defendant

had exhibited a strong desire for acceptance, had been easily led and influenced, and was susceptible to the suggestion of a companion that defendant engage in violent behavior.

And unlike in *Lawrence* (where murder was the only crime that was ever committed by the inmate, was committed under significant emotional distress, and was the only basis for the finding that the 61-year-old inmate posed a current danger to public safety 36 years after the murder), the Governor cited as evidence of 49-year-old defendant's current dangerousness not only the circumstances of the aggravated murder he committed 22 years earlier, but also his prior crimes of violence and his postincarceration threats against prison staff.

We reiterate that the Governor had to base his decision on the same factors that restricted the Board's discretion in determining whether a life-term inmate will "pose an unreasonable risk of danger to society if released from prison" (§ 2402, subd. (a)), but that the Governor had the "discretion to be 'more stringent or cautious.' " (*Lawrence, supra*, 44 Cal.4th at p. 1204.) And it is " 'irrelevant' " whether we might believe that the evidence tending to establish suitability for parole " 'far outweighs' " the evidence demonstrating unsuitability for parole. (*Ibid.*) " 'As long as the Governor's decision reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, [our] review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision.' [Citation.]" (*Ibid.*, original italics.)

It is apparent that, by citing both circumstances tending to show unsuitability for parole and circumstances tending to show suitability for parole, the Governor considered all of the factors he was required to consider. And it appears that the Governor acted cautiously in finding that despite the many positive steps defendant has taken in prison to address the problems that led him to commit murder, he posed an unreasonable risk of danger to society in 2006 if released on parole.

Defendant's especially heinous, atrocious, or cruel method of murder; his prior acts of violence; his threats to prison staff after incarceration; and the psychologist's opinion that defendant "continues to exhibit dependent features and an exaggerated need for acceptance" (a mental state that had contributed to defendant's history of violent crime) are some evidence supporting the Governor's finding that defendant was unsuitable for parole in 2006.

Nevertheless, the Governor's written decision is flawed because it does not contain an explicit "articulation of a rational nexus between those facts and current dangerousness" (*Lawrence, supra*, 44 Cal.4th at p. 1227).[3] Nor does it cite the mental state evidence that supports the Governor's finding, and "it would be inappropriate for courts to salvage the Board's [or the Governor's] inadequate findings" "not articulated in [the parole] decision." (*In re Roderick* (2007) 154 Cal.App.4th 242, 265 [65 Cal.Rptr.3d 16].) Thus, we will grant defendant's petition for writ of habeas corpus.

For the reasons stated in the introduction of this opinion, we conclude the appropriate disposition is to remand this case to the Governor for further proceedings consistent with the standards articulated in *Lawrence, supra*, 44 Cal.4th 1181. We do so also because we are unable to tell whether the Governor relied on the mental state evidence identified above.

## III

Defendant argues the Governor's reversal of the Board's finding of suitability for parole "was the product of biased decision-making that capriciously disregarded the statutory design for parole and the legion of court decisions seeking to curb [the Governor's] lawlessness." In defendant's view, the Governor "does not even make a pretense of conforming to the legislative charter of [Penal Code] section 3041 that a life-sentenced prisoner normally be granted a parole date early in his term." Accusing the Governor of "replacement of the legal standards for parole with his own personal and political ones," defendant castigates the Governor for his purported "routine denial of parole," and asserts that the Governor is making a "mockery" of the parole decision process. Defendant even goes so far as accusing the Governor of "making a mockery of the judicial branch, as he continues to deny parole regardless of countless court holdings finding his reversals lawless."

Such hyperbole is not supported by the record and does not assist defendant's prayer for relief. In his defense, the hyperbole comes not from

---

[3] *Lawrence* held that the Governor's decision to deny parole must contain an "articulation of a rational nexus between th[e] facts and current dangerousness" *in the following context*: "When, as here, all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Lawrence, supra*, 44 Cal.4th at pp. 1226–1227.) Although couched as an evidentiary standard, the holding is more akin to a procedural requirement to allow meaningful judicial review. As such, it logically extends to all facts upon which the Governor relied to deny parole.

defendant but from his appointed counsel. This leads us to observe once again: " '[I]t is vital to the integrity of our adversary legal process that attorneys strive to maintain the highest standards of ethics, civility, and professionalism in the practice of law.' [Citation.] Indeed, unwarranted personal attacks on the character or motives of the opposing party, counsel, or witnesses are inappropriate and may constitute misconduct. [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 412 [41 Cal.Rptr.3d 453].)

## IV

In the traverse, defendant's appointed counsel argues the petition for writ of habeas corpus "should be granted because the Governor's reversal of his parole grant violates the ex post facto prohibitions in the federal Constitution." The issue is forfeited because it was not raised in the petition filed in propria persona by defendant. (See *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) The issue is also forfeited because it is asserted without any argument or authority for the proposition. (*People v. Hardy* (1992) 2 Cal.4th 86, 150 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

In any event, the traverse acknowledges the California Supreme Court has rejected such an ex post facto claim of error, and counsel simply "reiterates this claim here to preserve this issue for further review" (assuming he can do so without having tendered in this court any argument or legal authority to support his claim).

## V

Lastly, defendant complains that the trial judge who denied defendant's petition for writ of habeas corpus filed in the Shasta County Superior Court "Should Have Recused himself." Aside from the fact that defendant offers no authority to support this contention (see *People v. Hardy, supra,* 2 Cal.4th at p. 150; *Atchley v. City of Fresno, supra,* 151 Cal.App.3d at p. 647), the claim of error is not cognizable, indeed is immaterial, in this new petition for writ of habeas corpus filed in this court. This is so because we review the Governor's decision, not the decision of the trial judge who denied an earlier petition.

## DISPOSITION

The petition for writ of habeas corpus is granted, and the matter is remanded to the Governor with directions to vacate his decision of October 10, 2006, which reversed the Board's finding in 2006 that defendant was suitable for parole, and to reconsider the matter consistent with the standards articulated in *Lawrence, supra*, 44 Cal.4th 1181.

Nicholson, J., and Robie, J., concurred.

Petitions for a rehearing were denied March 6, 2009, and the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied June 10, 2009, S171139.